JOSEPH S. PETERSON and ZINA S. PETERSON, Appellants, v. T. B. BUDGE and EZRA T. BUDGE, Respondents.

No. 1948. Decided April 20, 1909 (102 Pac. 211).

1. DEEDS—VALIDITY—EVIDENCE OF FIDUCIARY RELATIONS—EVIDENCE. In a suit to cancel a deed, evidence *held* to show that the fiduciary relation of physician and patient existed between the parties, as was claimed by plaintiff. (Page 606.)

2. DEEDS—VALIDITY—EVIDENCE AS TO CONSIDERATION. In a suit to cancel a deed, evidence *held* to show that its value was far in excess of the amount for which it was sold, as was claimed by plaintiffs, and that the consideration was wholly inadequate. (Page 606.)

3. DEEDS—VALIDITY—INCAPACITY OF GRANTOR—EVIDENCE. In a suit to cancel a deed, evidence *held* to show that the vendor at the time of execution of the deed was seriously affected with a nervous trouble which confined him to his bed for more than six weeks, and that he was unable to transact business by reason thereof. (Page 606.)

4. DEEDS—VALIDITY—UNDUE INFLUENCE—EVIDENCE. In a suit to cancel a deed, evidence *held* to show that the parties thereto had been close friends, and that the purchaser had great influence over the vendor. (Page 608.)

5. CONTRACTS—TRANSACTIONS BETWEEN PERSONS IN FIDUCIARY AND CONFIDENTIAL RELATIONS. Transactions between persons occupying fiduciary and confidential relations with each other, in which the stronger or superior party obtains an advantage over the other, cannot be upheld. (Page 609.)

6. CONTRACTS—TRANSACTIONS BETWEEN PHYSICIAN AND PATIENT—ABUSE OF CONFIDENCE. From the time the relation of physician and patient is created, till it ceases to exist, the physician is not only bound to act in the utmost good faith in the treatment of his patient professionally, but is inhibited from taking advantage of the confidence growing out of the relation reposed in him by his patient, and by misrepresentation or other unfair means, or by the exercise of undue influence, inducing his patient to convey, transfer, or otherwise dispose of to such physician, or to other parties, whom he may represent in other capacities, valuable property rights for a wholly inadequate consideration. (Page 609.)

7. CONTRACTS—TRANSACTIONS BETWEEN PERSONS IN CONFIDENTIAL RELATIONS—BURDEN OF PROOF. In actions involving the validity of a transaction between persons in confidential relations, the burden of proof is cast on the superior party to establish the perfect fairness, adequacy of the consideration, and equity of the transaction. (Page 609.)

8. DEEDS—SUIT TO AVOID SALE—TRANSACTIONS BETWEEN PHYSICIANS AND PATIENT—BURDEN OF PROOF. It having been shown that the confidential relation of physician and patient existed between the parties at the time of the execution of a deed which the patient sought to avoid for fraud and undue influence, the burden of proof shifted, and it became necessary for defendants, to uphold the sale, to show that it was for an adequate consideration, and that the entire transaction on their part was fair, just, and equitable in every particular. (Page 610.)

9. DEEDS—SUIT TO AVOID SALE—TRANSACTION BETWEEN PHYSICIANS AND PATIENT—EVIDENCE AS TO MISREPRESENTATIONS. In a suit against physicians to cancel a deed to them by their patient, evidence *held* to show that if they. did not actively participate in inducing their patient, while ill, to believe that a bank was about to foreclose, and compel him to sacrifice the property, they voluntarily accepted the conveyance knowing such misrepresentations to have been made, and that such inducements were brought to bear on him. (Page 614.)

10. DEEDS—VALIDITY—SALE—PHYSICIANS AND PATIENT—BURDEN OF PROOF—EVIDENCE TO SUSTAIN. In a suit against physicians to cancel a deed to them by their patient, *held*, that they failed to sustain the burden of proof cast on them by law to show that the transaction on their part was in every respect open, fair, and equitable. (Page 614.)

APPEAL from District Court, First District; *Hon. Ferdinand .Erickson,* Judge.

Action to cancel and set aside conveyance.

REVERSED AND REMANDED.

*A. G. Horn* for appellants.

*Jesse R. S. Budge* and *Nebeker, Hart & Nebeker* for respondents.

### APPELLANTS' AUTHORITIES.

We respectfully contend that the rule is that where confidential relations exist that transactions between such parties are held to be presumptively void as being obtained through undue influence and the burden of proof in such cases shifts so as to require the beneficiary to establish the validity of the transaction. (Smith on the Law of Fraud, secs. 190, 115, 106, 107, 100; 9 Cyc. 456; 6 Ency. of Evid., pp. 11 and 13; *Jennings v. Connell*, 17 Ill. 148; *Ziegler v. Hughes*, 55 Ill. 288; *Cowee v. Cornell*, 75 N. Y. 91; *Garvin v. Williams*, 100 Am. Dec. 314; *Hardley v. Cuthbertson*, 108 Pa. St. 395.)

### RESPONDENTS' AUTHORITIES.

"It is for the plaintiff to show clearly that the parties can be placed in *statuo quo* and it is not for the defendant to show to the contrary." (*Kelly v. Owen*, 120 Cal. 502; *Buena Vista Fruit v. Tuohy*, 107 Cal. 243; *Gifford v. Carvill*, 29 Cal. 589; *Bryant v. Stothart*, 46 La. Ann. 485; *Ackerman v. McShane*, 43 La. Ann. 507; *Herman v. Haffenegger*, 54 Cal. 161; Cases cited and notes to 50 Am. Dec. 674, and 74 Am. Dec. 661; *Canal Co. v. Roach*, 78 Cal. 552; *Loaiza v. Superior Court*, 85 Cal. (11) 30; *Hammond v. Wallace*, 85 Cal. 522, s. c. 20 Am. St. Rep. 239; *Potter v. Ins. Co.*, 63 Me. 440; *Babcock v. Case* [Penn.], 100 Am. Dec. 654; *Ahrens v. Adler*, 33 Cal. (608) 616; *Mitchell v. Moore et al.*, 24 Iowa 394; *Parks v. Evansville*, 23 Ind. 567; *Wilber v. Flood* [Mich.], 63 Am. Dec. 203; *Herrin v. Libbey*, 36 Me. 357; *Gould v. Cayuge, etc.*, 86 N. Y. 75-82; *Cobb v. Hatfield*, 46 N. Y. 533; *Evans v. Gale*, 17 N. H. 573; *Thayer v. Turner* [8 Metc. 550].; *Kimball v. Cunningham*, 4 Mass. 502.)

### STATEMENT OF FACTS.

Plaintiffs, Joseph S. Peterson and Zina Peterson, husband and wife, brought this action against T. B. Budge and Ezra

T. Budge, to cancel and set aside a deed of conveyance to a certain piece of real estate situate in and being a part of lot four, block twelve, plat D, Logan City survey, in Cache County, Utah. The deed in question was made and executed by the plaintiffs to defendant T. B. Budge on January 6, 1906. The grounds upon which plaintiffs base their right to have the deed set aside, as set forth in their complaint, are: (1) Fraud, undue influence, and want of consideration; (2) that at the time the deed was made and executed plaintiff Joseph S. Peterson was confined to his bed with sickness which rendered him totally unfit to do or transact any business whatever; (3) that during said illness he was attended in a medical way by defendant T. B. Budge and his brother David C. Budge, doctors, in their professional capacity, and that the fiduciary relation of physician and patient was thereby created, and that this relationship of trust and confidence existed between them at the time the deed in question was made and executed; (4) that during the time of this fiduciary relation, and while said Peterson was wholly unfit and incapacitated to transact business, his said physicians, T. B. Budge and D. C. Budge, by fraud and undue influence obtained from him the deed to the property mentioned. Defendants, in their answer, admit "that during part of the times mentioned in the complaint D. C. Budge attended upon plaintiff and his family in the capacity of a physician and surgeon; admit that plaintiff Joseph S. Peterson, on or about the 6th day of January, 1906, was slightly indisposed, but in this connection defendants allege that at all times at and prior to the 6th day of January, 1906, when said plaintiff and defendant T. B. Budge were negotiating for the sale and purchase of said property, and at the time of conveying the same, said plaintiff, Joseph S. Peterson, was in full possession of his mental faculties, and in no wise incapacitated from attending to business." The answer also denies that any fraud or undue influence was used, and denies that the conveyance was made without consideration.

The facts, as disclosed by the record, are about as follows: The land in question is fifteen rods in length by six rods in

width, and upon it are two frame dwelling houses, one of which has eight and the other seven rooms, besides the hallways and closets therein. There are cement walks leading from the houses to the sidewalk, and also a good barn on the premises. These improvements were constructed in a substantial and workmanlike manner, and, at the time the deed in question was made and executed, were comparatively new. When the transaction complained of was entered into, Joseph S. Peterson was, and for some time prior thereto had been, residing upon and occupying the premises as a homestead. He and his family lived in the larger of the two houses and rented the smaller one. Plaintiff called six witnesses who testified as to the market value of the property at the time the sale under consideration took place. W. J. Hill, the first witness on this point, testified, in part, as follows: "I have lived in Logan over four years. I speculate, buy, sell, and loan money on real estate, and am acquainted with the reasonable market value of real estate in Logan. I am acquainted with the Peterson property. I once owned the place and sold it in 1904. I made a special investigation of the value of this property shortly before the first of the year 1906, with a view of buying it, and made an offer for the same. In January, 1906, I would consider this property worth from $7000 to $7500. The latter part of December, 1905, I offered to loan Joseph Peterson $4000 on the land here in dispute, or to buy it for $6000 cash, and he refused." And further: "The Peterson property is in a good location, has good buildings on it, and I consider it worth $7000, the improvements being new. I sold this ground for $1000 in 1904. It was vacant then."

Joseph S. Peterson and his brother, Nephi Peterson, testified to substantially the same facts as the witness Hill respecting Hill's offer to either purchase the property for $6000 or to make a loan of $4000 thereon. Another witness, Hyrum Hayball, who was president, and a member of the "loan board" of one of the banks in Logan City, testified: That he knew the Peterson property; that he "examined these houses at the time they were built and and just before they

were completed, and had a fair idea as to how they were constructed; that in January, 1906, the property was worth about $5500." Two other witnesses, who were contractors and builders in Logan City, testified that they were familiar with the market value of property in the vicinity of the Peterson property. One fixed the value at about $6000, and the other at $6500, in January, 1906.

Joseph C. Knowles, another witness for plaintiffs, testified: "I write fire insurance, and am, and have been, county commissioner for three years past, and as such am a member of the board of equalization. . . . While acting as a member of the board of equalization, have familiarized myself with the market value of real estate throughout Cache county. . . . I investigated the value of the Peterson property with a view of writing insurance upon the same. In January, 1906, I would judge the property to be worth between $7000 and $8000. I examined the buildings at the time they were constructed, and am acquainted with them."

Oliver Skanchy, a dealer in lumber, and who furnished some of the material for the construction of these houses, and who assisted in making some of the plans and specifications for their construction, testified: That he was well acquainted with the values of real estate in Logan City. That "during 1905 I appraised the Peterson property for the Thatcher Bros.' bank. Values have not changed since then. In January, 1906, the Peterson houses were worth from $6500 to $6700."

W. D. Cranney, another witness for plaintiffs, testified: "I have lived next door to the Peterson property for four years, and am acquainted with the value of real estate in that vicinity, both from buying and selling real estate close to that property and from knowledge of other sales. In January, 1906, the Peterson property was worth $6000."

H. E. Hatch, cashier of the Thatcher Bros.' bank, was called as a witness by defendants, and testified, in part, as follows: "I am acquainted with the Peterson property on which Thatcher Bros.' bank made a loan of $3000. I investigated its value at that time. . . . In January, 1906,

that property was worth $4500." On cross-examination he said: "The bank, in making the loan on the Peterson property, had it examined by others. . . . It was appraised by Oliver Skanchy, Aaron Farr, and a man by the name of Sorenson, . . . and they placed the value at about $8,-000 to $8500, except Mr. Farr, who placed it at about $6500."

John A. Crockett, another of defendants' witnesses, testied: "I am an abstracter. Am engaged in real estate. I am acquainted with what property has sold for in Logan in a general way. . . . I have recently made an examination of the property from the standpoint of insurance and can form a judgment as to its market value on January 6, 1906. In my opinion it was worth $4000." On cross-examination the witness testified: "On property such as the Peterson property, improvements very largely govern the value. I do not know the exact size of the barn. It is probably 40x60. I have never been inside and know nothing whatever of its interior construction. I do not know what kind of a roof is on it. I have never been in either house, . . . and do not know how the buildings are constructed. I know how the houses are put up in a general way. . . . I don't know if there are adobes in the walls. If there are it would add considerable to the value. I would add twenty-five per cent. if there are adobes between the uprights or studding." The evidence of other witnesses shows that there were adobes in the walls. Therefore, according to the evidence of this witness, the value of the property was $5000.

A. E. Cranney, for the defense, testified: "My business is real estate and loans. . . . I am acquainted with real estate values in Logan, . . . and am generally familiar with the market values in the vicinity of the Peterson property. Assuming that the improvements are as stated by counsel, I would say that in January, 1906, this property was worth between $4000 and $5000." On cross-examination he stated: "I do not know the size of either house, or how many rooms there are in each house, or on each floor. I was in the houses about a year ago, but have no recollection how

they are finished. I have been in the barn, but cannot tell the exact size of it. I could only give an idea. In determining the value it is necessary to take these things into consideration."

H. A. Pederson, a dealer in real estate, and who claimed to be familiar with the market value of real estate in Logan, testified: "I have passed by the Peterson houses and just looked in the front doors. Couldn't see the interior construction from there, and I pass my judgment of values on that. In my judgment that property in January, 1906, was worth $4500."

D. C. Budge, who figured in the transaction, and one other witness for the defendants, testified that the value of the property at the time the deed was made and executed was $3500. D. C. Budge also testified to the rental value of the premises, as follows: "The small house was bringing $16 per month, and the large one $20 per month."

The evidence without conflict shows that Joseph S. Peterson became sick in December, 1905, and did not fully recover until some time in February, 1906. Zina Peterson, his wife, testified that he took sick about December 24th, and "kept gradually getting worse until he took to his bed and was very sick for two or three weeks. . . . He was confined to his bed after December 27th, until about February 11th. . . . After he went to bed, D. C. Budge and T. B. Budge attended him as doctors until he was able to get up again."

Willard Cranney, a witness for the plaintiffs, testified, in part, as follows: "About January 6, 1906, I lived next door to Peterson and called on him about that date. He was in bed and very sick. . . . He was very nervous. He was a sick man. He looked wan and haggard, and was what I would call a nervous wreck."

Nephi Peterson, a brother of Joseph S. Peterson, testified: "When he deeded the property to Dr. Budge, he was pretty sick, both before and after that. He looked to me to be pretty bad. He was not able to help himself, and was confined to his bed all the time. . . Whenever I called, Dr. Budge was usually there."

J. Z. Stewart, Jr., an attorney at law, who was called in by the parties to draw up the deed in question, was called as a witness for the defense, and testified, in part, as follows: "When I called on Joseph Peterson upon the occasions mentioned, he was quite sick and confined to his bed, and had the appearance of being a sick man. He was pale and quite nervous, and his hands trembled when he signed the documents." On cross-examination, in answer to a question propounded by plaintiffs' attorney, he answered: "On a number of occasions I stated to you that the condition of Mr. Peterson when he signed the deed was such that in my judgment he was in no condition to do business, and that is true." On redirect: "I mean by this that he was not mentally incapable of understanding what he was doing. . . . I mean that, while his mind was bright, yet, when a man was as sick as he was, he was in no condition to do business without injury to himself. He would know what it was, and he might be pushed beyond his better judgment when he was so weak."

D. C. Budge in his testimony stated that in the latter part of December, 1905, "Mrs. Peterson phoned me and said her husband was sick and to come down. . . . This was about a week before the deed was signed." In April, 1906, the Budges sent Peterson a statement of his indebtedness to them for medical services, which, so far as material here, is a follows: "Mr. Joseph S. Peterson. In account with Drs. Budge & Budge, Physicians and Surgeons. August 5, 1905. To services, $3.00. December 4, 1905. To services. $1.50. January 6, 1906. To services, $2.50."

Joseph S. Peterson (plaintiff) testified, and his testimony is not contradicted: "They (referring to the Budges) have been my family physicians since they came to Logan, about 1904, until after the transaction complained of in the complaint. We depended on D. C. Budge exclusively. When anything was ailing us, we would call on him, and, if he couldn't come, why, T. B. Budge would come." He further testified: "About December 27, 1905, I became bedridden and confined to my house until the first part of February. D.

C. and T. B. Budge attended me during this illness as physicians and prescribed for me."

D. C. Budge testified, referring to the time the negotiations for the sale in question were going on: "I may have prescribed something the first time I was down. I couldn't say. I think I did. I did not think he was a very sick man. His ailments were slight. . . . He was more or less run down and nervous, and anything which would tend to over-stimulate the mind, or overwork, would add to what he already had, . . . and would endanger his general health more or less."

The foregoing is a summary of the evidence in the case respecting the value of the property, the mental and physical condition of Joseph S. Peterson, and the alleged fiduciary relations existing between him and the Budges at the time the trasactions under consideration took place. The court, in its findings of fact, found: "That no confidential or fiduciary relations existed between plaintiffs or either of them and T. B. Budge or D. C. Budge at the time said sale was made or said conveyance executed; that, at different times prior and subsequent to the date of said sale, the said T. B. Budge and D. C. Budge acted as physicians in the family of plaintiffs, but there was no relation of physician and patient between said persons at or during the time of the negotiations for the sale of said property; that the fair cash value of said property at the time of said conveyance was somewhat in excess of the consideration paid therefor, but the exact value of said property at the time of said conveyance cannot be ascertained on account of the conflict in evidence; that there was not such an inadequacy of consideration as to enable the court to grant plaintiffs any relief on that ground." The court found against plaintiffs and in favor of defendants on the issues involving the question of Joseph S. Peterson's mental capacity and ability to transact business at the time the sale was made, and on the question of fraud and undue influence. As conclusions of law the court found "that the plaintiffs are not entitled to any relief in this action," and rendered judgment in favor of defendants and dismissed the complaint. To re-

verse the judgment plaintiffs have brought the action to this court on appeal.

McCARTY, J. (after stating the facts as above.)

It is contended on behalf of the plaintiffs, appellants, that the findings of fact are not only unsupported by, but are contrary to, the evidence, that the judgment is against law, and that the court erred in denying plaintiffs the relief prayed for in the complaint. We think this contention is well founded. The evidence conclusively shows that the fiduciary relation of physician and patient existed between Joseph S. Peterson and the Budges at the time the sale in question took place, and that the value of the property was far in excess of the amount for which it was sold to them. The trial judge, who heard the case, and who was confronted with the witnesses and had an opportunity of observing their appearance and demeanor while testifying, was convinced that the amount paid by the Budges for the property was far below its true value. This is shown by his memorandum of decision rendered and filed at the conclusion of the trial of the the case, wherein he says: "The court is convinced that the consideration ($3500) paid for the property is inadequate, and not in keeping with the true value thereof." Furthermore, according to the testimony of D. C. Budge, the yearly rental value of the property is $432, and the taxes assessed against it are about $50 per year. This would leave a net income of $382 per year from the property, which would be equal to eight per cent. interest per annum on a capital of $4775, seven per cent. on $5457, and six per cent. on $6367. The evidence on this point, considered as a whole, clearly shows that the value of the property at the time of the sale was from $5000 to $6000 and that the Budges got from $1500 to $2500 the best of the bargain. While there appears to be some conflict in the evidence as to whether Peterson, at the time he made and executed the deed, was very sick, or only slightly indisposed, the overwhelming weight of the evidence is to the effect that he was sorely afflicted with some kind of

nervous trouble or disorder, and that because of it was necessarily confined to his bed for a period of more than six weeks. On this point A. E. Cranney, a witness who was in no way connected with the transaction in question, and who had no special interest in the case pecuniary or otherwise, testified that Peterson "was a sick man," and was what he would call a "nervous wreck." J. Z. Stewart, Jr., testified that Peterson "was quite sick, . . . nervous, and exercised," and that he was in no condition to do business. Nephi Peterson testified that, when Peterson "deeded his property to Dr. Budge, he was sick, . . . not able to help himself, and was nervous." Zina Peterson testified that "he was very sick, . . . seemed very nervous and restless, and neither ate nor slept." On the other hand, the only witness who testified that Peterson's ailments were slight and of but little or no consequence was D. C. Budge, and he admitted that Peterson was "more or less run down and nervous," and that "excitement might endanger his general health more or less." And the record also shows that Peterson, during his illness, had a case in court which came on for trial January 11, 1906, and that D. C. Budge, in order that Peterson might get the case continued, gave him a certificate, of which the following is a copy: "Logan, Utah, January 11, 1906. To Whom it May Concern: This is to certify that Joseph S. Peterson is under my care, and that he is confined to his room unable to attend to any business which would necessitate much mental strain. D. C. Budge, M. D." And T. B. Budge, on cross-examination, testified as follows: "I made a certificate for Joseph S. Peterson covering his sickness from December 22d to February 12th, to enable him to recover from the insurance company upon his health policy. I don't know just what he received. I did not receive any of it." And the record shows that the Budges, on April 1, 1906, presented to Peterson an account for medical services, which they rendered him on the very day (January 6, 1906) on which the deed in question was made and executed. Therefore it clearly appears, not only from the evidence of the plaintiffs and their witnesses, but from the evidence of D. C. Budge and the foregoing cer-

tificates, that Peterson was sick and unable to transact business, and that the relation of physician and patient existed between him and the Budges during the time covered by the transactions in question.

The evidence further shows that Peterson and the Budges were, and for many years had been, close friends, and that Peterson had great confidence in the Budges, and that they had considerable influence over him. This is shown by their own evidence. Immediately after Peterson recovered from his sickness, he notified an attorney, who was about to file a petition in bankruptcy for him, to drop the bankruptcy proceedings, hereinafter referred to, which he claims the Budges, during his illness induced him to commence. He also made a seasonable and timely demand on the Budges to reconvey to him the property in controversy. This they refused to do, and Peterson, immediately thereafter, commenced this action. After the action was commenced, there appeared in a local newspaper in Logan, Utah, some comments respecting the origin of the suit, which were derogatory to and somewhat reflected upon the Budges, and they demanded of Peterson that he sign a written statement prepared by them for publication to counteract the comments referred to. In pursuance of this demand, the Petersons called at the office of the Budges and talked the matter over with D. C. Budge. During this interview Peterson called up his attorney by telephone, who was at Ogden, Utah, and informed him that he was at Dr. Budge's for the purpose of settling his difficulties with the Budges. D. C. Budge testified that he overheard Peterson's attorney admonish Peterson not to sign any papers, and that, notwithstanding this injunction from his attorney, he (Budge) prevailed upon Peterson to sign the paper referred to, which, so far as material here, recites: "I also desire to say that I have the greatest confidence in these gentlemen (referring to the Budges), and I know the differences existing between us are due to a misunderstanding on my part." D. C. Budge, being able to thus prevail upon Peterson to disregard the advice of his attorney when he (Peterson) was in his normal condition, both mentally and physi-

cally, is it not reasonable to suppose that the Budges could wield an equal, if not greater, influence over him when he was sick and in a state of mental prostration, such as the record shows he was in when he signed the deed in question? While Peterson's sickness may not have been of sufficient severity to wholly incapacitate him for the transaction of business, yet the evidence, practically without conflict, shows that he was stricken with some kind of nervous trouble, and that because of this trouble he was necessarily confined to his bed for several weeks, and that he was not in a condition, either mentally or physically, to attend to matters requiring much exertion or mental strain.

There is no rule of law more firmly established than that which holds that transactions between persons occupying fiduciary or confidential relations with each other, in which the stronger or superior party obtains an advantage over the other, cannot be upheld. In the case of *Viallet v. Con. Ry. & P. Co.,* 30 Utah 260, 84 Pac. 496, 5 L. R. A. (N. S.) 613, a question involving this same principle was before this court, and in the course of the opinion it is said:

"The law is well settled that from the time the relation of physician and patient is created, until it ceases to exist, the physician is not only legally bound to act in the utmost good faith in his treatment of his patient professionally, but he is inhibited from taking advantage of the confidence growing out of this relation, reposed in him by his patient, and, by misrepresentation, or other unfair means, or by the exercise of undue influence, induce his patient to convey, transfer, or otherwise dispose of, to such physician, or to other parties whom the physician may represent in other capacities, valuable property rights for a wholly inadequate consideration."

And the rule is well settled that in actions of this kind, where these confidential relations are shown to exist the burden of proof is cast upon the superior party to establish the perfect fairness, adequacy of consideration, and equity of the transaction. In Smith, Law of Fraud, section 190, the author says:

35 Utah—39

"The law is jealous, and public policy sanctions it, that transactions between persons occupying these relations shall receive the most careful scrutiny, and the burden of proof is shifted so as to require the beneficiary to establish the validity of bequest, gift, or grant." And again, in section 191: "Wherever a fiduciary relation exists, and there has been confidence reposed which invests the person trusted with an advantage in treating with the person confiding, it imposes the burden of proof upon the person taking securities, or making contracts inuring to his benefit to show that the transaction is just and fair, and that he has derived no unfair advantage from his fiduciary relation."

Mr. Pomeroy, in volume 2, section 956, of his excellent work on Equity Jurisprudence, says:

"While equity does not deny the possibility of valid 'transactions between the two parties, yet, because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and thereby overcoming the presumption."

In 6 Ency. of Ev., p. 10, the rule is tersely stated as follows:

"Thus, in transactions between persons occupying such relations, in which the stronger or superior party obtains a benefit or advantage, fraud is presumed, and the burden is cast upon the superior party to show fairness, adequacy, and equity in the transaction. This rule has been held applicable to transactions between attorney and client, . . . physician and patient."

The following authorities are to the same effect: 9 Cyc. 456-458; 1 Beach on Contracts, 825; 1 Page on Contracts, 214; *Cadwallader v. West,* 48 Mo. 483; *Woodbury v. Woodbury,* 141 Mass. 329, 5 N. E. 275, 55 Am. Rep. 479; *Unruh v. Lukens,* 166 Pa. 324, 31 Atl. 110; *Thomas v. Whitney,* 186 Ill. 225, 57 N. E. 808.

It having been shown that the confidential relation of physician and patient existed between the Budges and Peterson at the time the sale took place, the bur-

den of proof shifted, and it became necessary for the Budges, in order to uphold the sale, to show that it was for an adequate consideration, and that the entire transaction on their part was in every particular fair, just, and equitable. The circumstances leading up to and surrounding the transaction are, in brief, as follows: At the time Peterson took sick, Thatcher Bros.' Bank of Logan, Utah, held two overdue mortgages on the property involved in this action. One of the mortgages was for three thousand dollars and the other for one hundred and twenty dollars. Besides this mortgage indebtedness, Peterson owed D. C. Budge one hundred and four dollars and store bills to the amount of about two hundred and sixty dollars. He was also indebted for machinery which he had purchased, but this account was secured and a little later on paid. Soon after Peterson took sick, one Preston, in company with an attorney, called upon Peterson and requested him to give a mortgage on the property in controversy to secure a claim which he (Preston) held against him, but Peterson refused. A few days thereafter Preston, in company with his attorney and D. C. Budge, again called on Peterson and demanded security for his claim, and Preston's attorney then and there informed Peterson that, unless he furnished the security demanded, proceedings would be commenced to foreclose the mortgages held by the Thatcher Bros.' Bank on his property. Peterson again refused to give them a mortgage, and the attorney and Preston withdrew, leaving D. C. Budge and Peterson together. After Preston and his counsel had departed, Budge requested Peterson to give him a mortgage on the property in controversy to secure the payment of his claim of $104.

Up to this point there is no conflict in the evidence, but as to what transpired thereafter there is a sharp conflict. Peterson testified, and his testimony is corroborated by that given by Mrs. Peterson, that Budge said to him: "You can see that Preston and Nebeker are going to start suit against you and will squander some of your estate, and others are coming here after your property, and the only thing you can do, as we are old friends, is to turn it over to me, and

I will protect you. You had better deed it to T. B. Budge, . . . and in case we have to pay the mortgage T. B. could raise the money better than I could." That it was then and there understood and agreed that Peterson would deed the property to T. B. Budge, go through bankruptcy, and then the property would be reconveyed to him, provided he would reimburse the Budges for the money which they would in the meantime be compelled to pay out in order to protect the property from foreclosure proceedings. That it was several days thereafter before the negotiations were completed, and in the meantime the Budges called several times to see Peterson in regard to the matter. That when all the details were understood and agreed upon, an attorney was called in to prepare the papers and to advise the parties in regard to the legal phases of the transaction. The first time the attorney met with the Budges at the Peterson home to close the deal, he expressed a doubt as to the legality of the transaction, on the ground that Peterson's creditors might attack the conveyance and succeed in having it set aside. D. C. Budge then decided to take a mortgage on the property to secure the payment of the one hundred and four dollars that Peterson was owing him. A mortgage for this amount was made out by the attorney, and the Petersons signed it. Negotiations for the conveyance of the property to the Budges were immediately thereafter renewed, and, two days after the mortgage was executed, the Budges and the attorney again called at the Peterson home, and the deal in question was finally completed. As hereinbefore stated, the consideration was thirty-five hundred dollars. The three mortgages and the interest thereon amounted to thirty-two hundred and seventy-five dollars, leaving a balance of two hundred and twenty-five dollars due Peterson. This balance was turned over to the attorney to be used by him in paying the costs of the proceedings in bankruptcy, which it was understood would soon be commenced by Peterson, and to pay a few small bills that Peterson owed to different parties.

The Budges testified that they purchased the property outright, and they denied that there was any understanding or agreement to reconvey the property, or that the sale was in any sense a conditional one. There are some facts and circumstances, however, which tend to corroborate the testimony of the Petersons on this point: (1) Peterson's creditors, other than Preston and D. C. Budge, were not demanding an immediate settlement of their claims, and Thatcher Bros.' Bank had no intention to foreclose their mortgage on the property, and there was no necessity for the Petersons to dispose of their property at a sacrifice of from fifteen hundred dollars to twenty-five hundred dollars. (2) The mortgage for one hundred and twenty dollars which the Budges, according to their version of the transaction, assumed, was never paid by them, but was taken up and paid by Peterson's brother, nor did they pay the $3000 mortgage held by the bank, or any part thereof. (3) Soon after the Budges received the deed in question, they conveyed the premises to their father, Ezra T. Budge, who was a resident of the state of Idaho; the consideration being nearly twelve hundred dollars more than they were to pay Peterson for the same property. It is admitted, however, that Ezra T. Budge stands in no better position with reference to the title than the defendants T. B. and D. C. Budge. (4) The mortgage for one hundred and four dollars which the Budges held against the property, and which was to be paid out of the purchase price, they had recorded several days after they became vested with the legal title to the property covered by the mortgage. In other words, if their transaction with Peterson was *bona fide* they placed on record a mortgage of which they were in effect both mortgagors and mortgagees. If, however, the transaction was as Peterson claims, namely, that the property was conveyed to the Budges to be held by them in trust, there would be some good reason for the recording of the mortgage; otherwise not. Furthermore, no sane person, who is legally capable of transacting business for himself, would knowingly sacrifice from fifteen hundred dollars to twenty-five hundred dollars in property and go through bankruptcy in order to

be relieved from the payment of debts which do not exceed two hundred and sixty dollars, or at most three hundred dollars, and especially where, as in this case, it was estimated that the money required to take him through bankruptcy would nearly pay the obligation from which he seeks to be relieved. The only money paid out by the Budges on the transaction was the two hundred and twenty-five dollars which was turned over to the attorney to be used by him, or so much thereof as might be necessary to take Peterson through bankruptcy. As soon as Peterson recovered from his sickness, he served notice on the attorney to stop the proceedings in bankruptcy, and promptly demanded of the Budges that they reconvey to him the property in question.

We think the great preponderance of the evidence clearly establishes the following propositions: (1) That the plaintiff, at the time of the conveyance in question, was, and for about 10 days prior thereto had been, sick and nervous and greatly distressed in mind. (2) That, while in such mental condition, he was induced and led to believe by improper and undue influence that the bank was about to foreclose its mortgages and compel him to make a sacrifice of his mortgaged property. (3) That the confidential relation of physician and patient existed between the Budges and Peterson at the time the deed in question was made and executed. (4) That if the Budges were not active participants in leading and inducing Peterson in his highly nervous and debilitated condition, and while under great mental strain, to believe that the bank was about to foreclose its mortgages and compel him to sacrifice his mortgaged property—representations untrue in fact—they voluntarily accepted the conveyance, well knowing such representations to have been made, and such inducements brought to bear upon him. (5) That Peterson, because of his physical weakness and the nervous and unsettled state of his mind at the time the deed was made and executed, was in no condition to transact business requiring much exertion or mental strain. (6) That the consideration paid by the Budges was wholly inadequate. (7) That the defendants have failed to sustain the

burden of proof cast upon them by law to show that the transaction on their part was in every respect open, fair and equitable. Therefore, even if it were conceded that the Budges made no promises whatever to reconvey the property to Peterson, he still would be entitled to recover in this action.

After the Budges obtained the legal title to the property in question, they received and used the rents collected on the smaller house until January 11, 1908, on which date a receiver, on application of defendants, was appointed by the court to take possession of all of the property and to hold the same and collect the rents thereon during the pendency of the action.

The judgment is reversed, and the case remanded, with directions to the trial court to set aside the findings of fact and conclusions of law heretofore made, and to make findings quieting the title of the property in plaintiffs. It is further ordered that an accounting be had between the parties and that the party in whose favor a balance is found to be due have judgment for the amount of such balance. Costs to be taxed against defendants.

STRAUP, C. J., concurs.

FRICK, J. Dissenting.

I cannot concur in the result reached by my associates. I was originally of the opinion, in view of the whole record, that the judgment should be affirmed, but, after mature reflection, I have arrived at the conclusion that, for the reasons hereafter stated, the judgment should be reversed, and the cause remanded for a new trial.

Owing to the great mass of evidence and the irreconcilable conflict among the statements of the witnesses with respect to the controlling elements of the case, it is impracticable to set forth the evidence even in condensed form so as to give the reader an opportunity to arrive at an intelligent conclusion. I shall therefore quote only the statements of appellants from which it is apparent that their contentions with respect to the transfer of the property in question do not square with the theory upon which the case was ultimately,

tried and determined. Mr. Peterson, in giving the conversation between himself and respondent D. C. Budge, and which Peterson claims constituted the agreement and inducement to make the transfer, says: "Well, that was that he (Budge), that they, would get the deed from—that we should sign the deed over to them, and then he (Budge) should advance some money for to take me into bankruptcy, and after I had gone through bankruptcy he agreed to turn the property back to us." Mrs. Peterson, in her testimony, in giving her version of what was said, testified: "And Mr. Peterson asked Dr. Budge if he couldn't take these places, assume that mortgage, and to hold them until he (Peterson) felt as though he had money to redeem them from him (Budge), pay him for what he had paid on them, and he (Budge) first said that he didn't and Mr. Peterson says, 'Well, I think you could if you wanted to.' And D. C. says, 'No.' He says, 'I don't think I can.' He says, 'I haven't the money right at present to do it with, but,' he says, 'I'll talk to my brother T. B., and if he feels as though he wants to take them, why, it will be all right with me.'" After this Mr. Peterson's attorney was consulted, and he strongly advised against the transfer, and upon his advice Peterson executed the mortgage referred to in the prevailing opinion, by which respondents' claim was secured, and they seemed perfectly satisfied. The attorney testifies that he was with Peterson at least a "dozen times" preceding and during the negotiations, and, it seems, fully advised him with regard to his legal rights. The attorney further says that he never heard any conversations between Peterson and respondents whereby respondents agreed to reconvey the property; but the attorney says that he advised Peterson that, if Peterson intended to take advantage of the bankruptcy act, he should file a declaration of homestead on some other property Peterson then owned, and which was free from incumbrances, so as to give him an unincumbered home; that he, the attorney, at the request of Peterson, prepared such a declaration and filed the same for him.

I shall not refer further to any specific evidence, but will

give a brief outline of the conclusions which the trial court, in my judgment, was justified to draw therefrom, and which, in my judgment, are sustained by the clear weight of the evidence: (1) That the testimony of the appellant Joseph S. Peterson was wholly unreliable, and therefore to be considered only in connection with other credible evidence or circumstances which were corroborative of his statements. (2) That the testimony of Mrs. Peterson was not of great weight upon many of the controverted points, because she hardly had that personal knowledge of the matters which would give her testimony controlling weight or force. (3) That Peterson had a purpose in transferring the property to the respondents which was wholly independent of and apart from the reasons that he gave at the trial. The court was further justified in concluding that Peterson desired to go through bankruptcy after conveying the property in question, and that neither of the respondents in any way or to any extent influenced or advised him with respect to the matter, but that Peterson desired to do so for some reason satisfactory to himself at the time. (4) That the sickness or indisposition of Peterson was not as serious nor of the character he and some of his friends said it was; and further, that such sickness did not to any extent affect his mental faculties and had nothing to do with the transfer of the property—that is, the transfer would have taken place if Peterson had not been indisposed just as it did, all other things being equal; that Peterson's sickness was of but small importance because of the fact that his bill for medical service covering its whole period amounted to the insignificant sum of four dollars only. (5) That Peterson was at the time indebted to respondents, and that all they asked of him was to secure their claim; that before doing so Peterson called in his lawyer and discussed the contemplated transfer of the property and his (Peterson's) desire to take advantage of the bankruptcy act, and the attorney advised him not to do this, but to secure respondents' claim by executing a mortgage, which Peterson did, but afterwards changed his mind, and, contrary to the counsel and advice of his attorney, in-

structed him to prepare a deed of conveyance for the property to the respondents, which was accordingly done. (6) That, for a considerable period of time prior to the transfer of the property to the respondents, Peterson was seeking to dispose of this property at a figure much less than he said it was worth at the trial, but in excess of the price allowed him by respondents; that respondents repeatedly during the time of the negotiations, and before the transfer was made, urged Peterson to dispose of the property to some one else for any figure he might obtain for it, and that they did not want the property unless they could get it at the price suggested by them. (7.) That respondents, nor either of them, at no time importuned or requested Peterson to convey the property to them or either of them for the price named by them, or for any price, and did not use or exercise any influence over him nor make any misrepresentations to Peterson to induce him to make the transfer to them, but that Peterson did so after having independent and disinterested legal advice and counsel, and did so voluntarily, and while his mind was unaffected, except such effect as would arise from a mere nervous condition. (8) The court, in view of all the evidence, was also justified in concluding that there was neither actual fraud, restraint, undue influence, nor inducement of any kind practiced, exerted, or held out by respondents through or by the means of which Peterson was induced to make the transfer.

The court, however, was not justified in his finding and conclusion that the relation of physician and patient did not exist at the time of and immediately prior to the transfer of the property. I fear therefore that in arriving at his conclusions the trial court relied entirely upon actual, rather than upon presumptive, fraud. Had the court found that the relation of physician and patient existed, and had it appeared to me that he had given the relation due effect in arriving at his conclusions, I am firmly of the opinion that his judgment ought not to be disturbed at long range, in view of the great conflict in the evidence and the personal element, which always is to be given full scope in determining the

weight, if any, that is to be given to any particular witness or testimony. In view therefore that the court must have disregarded the presumption of influence and advantage which the law presumes to exist in a transaction between physician and patient in favor of the physician, I am not certain that the court would have arrived at the same conclusion he did if he had fully considered this presumption and had given it its proper scope and effect. I cannot agree, however, with the scope and effect this presumption is apparently given in the prevailing opinion when applied to the naked relation of physician and patient. When there is nothing except the bare relation of physician and patient, the rule that is generally applied to an attorney and to other relations of trust and confidence is not applied with full rigor to the bare relation of physician and patient. In speaking of this principle in its application to actual fiduciary relations, the author, in section 963, 2 Pom. Eq. Juris., says: "The same general principle extends, with *more or less force,* to dealings between physician and patient." (Italics mine.) This, in my judgment, is a clear statement of the law as I understand it.

A careful reading of the cases will also disclose that, while the general principle must always be kept in mind, nevertheless this principle must be applied in each particular case in accordance with the facts and circumstances developed in that case. For two well-considered cases illustrative of the general principle applicable between physician and patient, I refer to *Unruh v. Lukens,* 166 Pa. 324, 31 Atl. 110, and *Cadwallader v. West,* 48 Mo. 483. In both of those cases it will be seen that the principle is applied in its full scope as between physician and patient upon the ground that the physician was the trusted counsel and adviser of the patient in business affairs, as well as his physician. To say that the former feature is, to any extent, present in this case, is, in my judgment, wholly unwarranted by the evidence. Moreover, it seems to me that my associates have overlooked one salient, if not controlling, feature in this case. This feature is always considered by all courts where either actual or con-

structive fraud, or undue influence and elements of that character are involved. In this case Peterson had independent and disinterested legal advice. No one impugns or even questions the integrity of his legal adviser, and if Mr. Peterson refused to follow his advice, but desired to accomplish a purpose of his own in transferring the property, and did so voluntarily and deliberately, he cannot be heard to complain. In my judgment therefore the prevailing opinion, in view of the facts and circumstances, and in view of the force and weight which the trial coourt was authorized to give to the evidence and inferences, lays too much stress upon the mere relation of physician and patient. Upon the other hand, the trial court must have lost sight of the presumptions prevailing against respondents and thus may have given the evidence and inferences to be drawn therefrom greater effect than they were entitled to.

I am further of the opinion that too much importance is attached to the disparity between the value of the property as testified to and the consideration agreed upon between respondents and Peterson. If the evidence was such as would justify a finding that there was neither actual nor constructive fraud or influence—and I think it was—then the disparity of value became a mere element in the case to be considered and weighed in connection with all the other facts and circumstances. No doubt, where a fiduciary relation is established, the presumptions that it had some effect in inducing the gift or transfer prevails, and unless this presumption is entirely overcome, and the transaction is shown to be entirely free from the influence presumed, this disparity may alone be sufficient to turn the scales in favor of the donor or grantee. If the transaction is purged, however, from the influence presumed against it, then the mere disparity of value, unless greatly inadequate, is generally not of great importance. To illustrate: In this case the brother of appellant Peterson placed the value of the property at about $5500, one real estate dealer placed it at $4000, another at $4000 to $5000, and still another at $4500, while one of the respondents placed it at $3500. All the other witnesses

placed the value at different figures ranging from $5000 to $8000. In looking over the figures as given in the prevailing opinion of Mr. Justice McCarty, it will also be observed that the range of value covered by the same witness at times varies from $500 to $1000; that is, the same witness in his estimate says the property was worth, say, $5000 or $6000. If upon this evidence therefore either the court or jury had found the value at $4000, the finding would be amply sustained by the evidence. While it is true that an amount in excess of this would likewise be supported, it, however, only illustrates that the matter of value is, to a large extent, a mere guess, and I am unable to see why one extreme is not just as likely to be correct as the other.

True, most any one would be likely to follow the temptation which is always present in such cases to fix some point between the highest and lowest figure given. This for the purpose of fixing the value in condemnation or other proceeding where the value must be fixed at some point is always proper. But the same rule is not equally applicable when the sole question is whether the consideration paid is so inadequate as to indicate unfair dealing. I think in such a case other elements are to be considered. In the first place, as is clearly apparent from this record, the purchaser might be unwilling to purchase at a price placed upon the property by others. In the judgment of such purchaser the property may not be worth what another says it is, and, even if it were, the purchaser in making the purchase is entitled to his own judgment. Again, the purchaser may not desire to buy the property unless he can obtain it at what he considers a speculative price; that is, unless he feels reasonably certain that there is a profit in it for him. This again is his own affair. If therefore the respondents refused to take the property unless they could buy it at their own price, as they testified, and if they did not influence Mr. Peterson in any way, and he was free to act upon his own judgment, and did act upon it, then the law cannot aid him. In a case where a bargain and sale is not involved, but where it involves a transaction where one sustaining a fiduciary relation to another has, by

reason of such relation, obtained some property belonging to the beneficiary, or where in some transaction with the beneficiary the trustee has obtained property from such beneficiary by means of some alleged concealment or misrepresentation, then in all such cases the one who has obtained such property, or any interest therein, must not only show that he acted in the utmost good faith in obtaining it, but must go further and show that he has not reaped an advantage or benefit by the transaction. The rule, however, does not go to this extent where a physician deals with his patient in case where a sale of property is involved. The physician must, no doubt, overcome the presumptions that arise by virtue of the relation; but, when he has overcome those, he need not also show that the property he has purchased from the patient is precisely of the value that was paid for it. Even a physician may exercise his own judgment in dealing with his patient, if the transfer is otherwise fair, and the relation is not abused.

In this case the trial judge, whom we know to be conscientious and upright, was evidently not willing to place the value of the property at a figure greatly in excess of what respondents agreed to pay therefor, as is disclosed by his findings. He simply found: "That a fair cash value of said property at the time of said conveyance was somewhat in excess of the consideration paid therefor. . . . That there was no such an inadequacy of consideration as to enable the court to grant plaintiffs any relief on that ground." If the court had found the property to be of some definite value, and from the amount so found it would appear that the consideration paid was so far below the real value as to indicate that such difference was not a mere error or difference of judgment with regard to values, I could then say with some degree of certainty that there was something which operated upon Peterson's mind, either real or imaginary, which induced him to part with his property, and that respondents thereby obtained an advantage which in good conscience they ought not to retain in view of the relationship existing between them and Peterson at the time; but, even

then, Peterson would be required to place the respondents in *statu quo*. The trial court was not prepared to base such a finding upon the evidence, and he was in a much better position to judge of the weight to be given to the evidence than I am. I am clearly of the opinion therefore that the trial court should find the value of the property, and not leave it for us to hazard a guess upon it.

There is another feature of the case upon which, however, the trial court made no finding. After the action was commenced, the appellants and respondents seemed to have arrived at some understanding with respect to the controversy, and appellants then signed the paper referred to in the prevailing opinion. The circumstances under which this paper was signed were shown by at least three disinterested witnesses from whose testimony the conclusion is certainly well founded that there was neither influence nor coercion of any kind practiced by respondents at that time. Neither is it claimed that the relation of physician and patient between Peterson and respondents existed at that time. The effect of this transaction between the parties could well be considered as an affirmation of the transfer by Peterson. It is true that the Petersons claim that the transfer was based upon the promise of respondents that they would reconvey the property. The court, upon ample evidence, however, was justified in not believing these claims. Here again Peterson went contrary to the advice of his counsel, who was a lawyer other than the one who advised him in the principal transaction. My brethren seem to think that Peterson's disregard of this attorney's advice was caused by respondent's influence over him. I confess I can find no evidence or circumstance from which this inference may logically be drawn. Upon the other hand, it seems to me to be a strong inference that what respondents and their witnesses said about the transaction is in the main true, and that Peterson thought so himself.

For the reasons therefore that the court erred in finding that the relation of physician and patient did not exist, and that the court, to some extent at least, may thereby have been induced to find for respondents, I think the case should be

reversed. I have arrrived at this conclusion with less reluctance because it appears from the record that respondents were deprived of the opportunity at the trial of fully cross-examining Mr. Peterson upon the merits of the controversy, and that counsel for Peterson was likewise deprived of Peterson's assistance and counsel during a large part of the trial. I am of the opinion therefore that the judgment should be reversed, and the cause remanded for a new trial, upon which full findings should be made based upon the theory that the relation of physician and patient did exist at and immediately prior to the time of the transaction.