OLSON v. GADDIS INV. CO., et al.

No. 5398. Decided January 7, 1935. (39 P. [2d] 744.)
Rehearing denied February 9, 1935.

*L. B. Wight* and *A. R. Barnes,* both of Salt Lake City, for appellant.

*W. C. Hurd* and *E. A. Rogers,* both of Salt Lake City, for respondents.

MOFFAT, Justice.

The plaintiff, appellant, seeks rescission and termination of a contract for the purchase and sale of an apartment property, known as the Delphia Apartments, located at No. 251 South 4th East street, Salt Lake City, Utah. The allegations found in the pleadings and the evidence disclose that the defendant Laura M. Johnson was the owner of the Delphia Apartments; E. H. Johnson was her husband and not otherwise interested in or connected with the interests in litigation; that Mrs. Susan K. Olson was the owner of certain properties located on Euclid avenue in Salt Lake City known as Nos. 956 to 963 on said avenue, with improvements thereon consisting of one double brick house and three small frame houses; that Gaddis Investment Company was the agency through or by whom the transaction relating to the properties was negotiated; that the Gaddis Investment Company is a corporation of which Thomas E. Gaddis is the president and in active management of its affairs.

The plaintiff further alleges that it was entirely because of the solicitations of the Gaddis Investment Company and its agents that she was "called upon, importuned, cajoled, urged, solicited and advised" to purchase the property of Laura M. Johnson; that it had been represented to her that the apartment property had a market value of $30,500 and that it would be to her advantage to purchase said property; that the apartment property had been fully rented and would continue to be; that a written statement showing the rentals that had been received and the costs and expenses of operating said apartment property had been furnished to her; that said agents and representatives had represented to plaintiff that the earnings or profits from the said apartment property would be sufficient to meet the payments required to be made upon the contract price; and that plaintiff was informed and believed and upon that ground alleged that the said statements were false and fraudulent, and known to be false and fraudulent at the time they were made. Plaintiff also alleged that because of the importunities, advice given

to her, and the confidence she had in the Gaddis Investment Company, and her reliance thereon, and because of her age and weakened condition, she was induced to enter into the contract with Laura M. Johnson on the 19th day of February, 1929, to purchase said apartment property. ,

It is further alleged that the contract or purchase price of the apartment property, including a frigidaire plant, was $31,600; that plaintiff was allowed for her Euclid avenue property the sum of $8,000, less a mortgage of $1,350, or a net down payment of $6,650, leaving a net balance on the purchase price of $24,950 payable in monthly installments of $200 each, deferred payments to draw interest at the rate of 7 per cent per annum.

Other allegations are contained in the complaint relating to falling off of rents, costs, and expenses of operation, upkeep, repairs, and purchases for renewals, and that it will be impossible for plaintiff to carry out the contract notwithstanding a reduction of the monthly payments from $200 per month to $175 per month and finally to $150 per month. That plaintiff had, before bringing suit for rescission and cancellation of the contract and recovery of her own property, requested defendants to cancel said contract, but that defendants had refused so to do. Plaintiff alleged on information and belief that the value of the apartment property she had agreed to buy for $31,600 did not exceed in value the sum of $20,000. She prayed for cancellation and rescission or for damages and an accounting.

Defendants answered admitting the former ownership of property, the corporate character of the Gaddis Investment Company, that plaintiff was in arrears in her payments, and denying all other allegations of the complaint; and filed a counterclaim setting forth the contract, its terms, plaintiff's default, and praying that plaintiff take nothing by her complaint, that it be dismissed, that plaintiff be declared in default, and prayed for restoration of possession of the apartment property, costs, and general relief.

Evidence was introduced upon the issues formed (and upon a multitude of collateral matters making a record of over 700 pages). The court made findings and entered judgment in favor of the defendants and against plaintiff. The case is in this court upon plaintiff's appeal. Could this court consider the eloquent and touching appeal made by the way of preface to appellant's brief with its picture of sex, widowhood, frailty, and abused confidence with the resultant loss of property and the conditions imposed thereby, there would be no need for an examination of the record. We have, however, made a very careful examination of the complete record. It is by that record, made by the trial court, that this court must be guided. It is by that record we are bound.

The trial court, after finding the facts of corporate existence, ownership of the respective pieces of property involved in the exchange or sale before consummation of the transaction, in substance further found and decided: That during the month of January, 1929, plaintiff requested the Gaddis Investment Company to effect a trade of her property for an apartment house. That the reasonable market value of plaintiff's property was about $5,000 subject to a mortgage of $1,300. That at no time were representations made to plaintiff that the market value of the apartment was $31,500, but that the Gaddis Investment Company told plaintiff that said property could be procured for $31,600, and that was the price fixed by Laura M. Johnson:

"* * * But that the said Laura M. Johnson would not under any circumstances accept the property of the plaintiff on the deal; that the Gaddis Invstment Company, finally made a deal whereby one Peter Johnson accepted the property of the plaintiff at a valuation of $8,000 and Laura M. Johnson accepted some property of Peter Johnson and said Laura M. Johnson gave a contract of purchase upon the Delphia Apartments."

The court further found that up to about the time of the conveyance of the Delphia Apartments to the plaintiff they had been fully rented and occupied, that at the time the con-

tract was entered into there were two vacancies, which fact was known to the plaintiff; that plaintiff was advised as to the approximate income from and expenses of operating the apartment property theretofore received and incurred; that no misrepresentations were made to the plaintiff. The court also found that plaintiff examined the property and consulted and advised with other persons as to the advisability of consummating the transaction. The court also found that the apartment property agreed to be purchased by plaintiff, on the 19th day of February, the date of the contract, had a fair market value of approximately $27,500 without the installation of the frigidaire, that the value of the frigidaire installation was $1,160. Findings were further made as to the payments made, the indebtedness incurred, and the default or arrears of the plaintiff, and that none of the defendants knew or could have known that the plaintiff would fail in making the payments provided in the contract, and that none of the defendants had any intention or purpose of defrauding plaintiff, and that plaintiff was estopped because of laches. Other and further findings were made upon matters, some of which were collateral, some immaterial, and some material. Sufficient of the findings, however, have been set forth as we view the case to make clear and furnish a basis for what follows.

The decree provided that the plaintiff was not entitled to recover upon her complaint and it was dismissed. Restitution of the premises to the defendant Laura M. Johnson was decreed, plaintiff was restrained from collecting further rents, and was ordered to account concerning the furniture.

Appellant has assigned numerous errors. The errors assigned and argued may all be grouped into three classes. (1) Those relating to objections to evidence offered and admitted or rejected by the court. (2) Those claiming that the findings are not supported by or are contrary to the evidence. (3) Those attacking the judgment. Twelve of the assigned errors are based upon rulings of the court, all but one of which were objections to evidence

claimed to be immaterial, the other to the introduction of evidence the other side thought immaterial. The trial court had early in the trial advised counsel that any immaterial evidence that might be admitted would be disregarded. The latitude accorded counsel probably accounts for the extended records covering matters almost, if not entirely, collateral and therefore not essential to a decision of the issues actually before the court for determination. It was upon these matters largely that objections to the evidence were made. In view of what the court said about the matter and that such matters as were admitted over objection were even in the view of counsel as indicated when the exceptions were taken, immaterial, aside from the unnecessary extension of the record, were harmless.

The complaint contains no direct or specific allegations of facts actually misrepresented to the plaintiff by any of the defendants. *Smith et al* v. *Edwards et al.*, 81 Utah 244, 17 P. (2d) 264. By way of inference it is asserted that the defendants knew or should have known that the business ability of plaintiff was such, coupled with the magnitude of the undertaking as revealed by what followed, that the plaintiff would not succeed in the venture. Such an issue is so general, related to so many factors involving judgment, energy, ability, fluctuations of values, conditions and circumstances, present and future, as to be of doubtful efficacy as a pleading, difficult, if not impossible, of proof if held to proof of substantial stated and related facts. One may readily appreciate the difficulty of attempting to establish fraud upon an estimate of personal abilities, no matter how familiar one may be with another as to business experience when coupled with future efforts, earning power, related to the operation of a business where fluctuating values control much of the subject-matter affecting income.

It was not shown by allegation and proof that there existed a course of dealing or otherwise of such duration and character as to establish a confidential existing relationship between the plaintiff and the defendants such as to bring the

matter within the rule that where it is shown that confidential relations exist, then the burden of establishing fairness, the adequacy of consideration, and the equity of the transaction would shift to the defendants, as stated in *Peterson* v. *Budge,* 35 Utah 596, 102 P. 211. We think there were neither adequate allegations nor sufficient proof to establish any such confidential relationship between plaintiff and defendants. Because one or more of the agents of the Gaddis Investment Company had previously collected some rents for plaintiff, and that the Gaddis Investment Company on infrequent occasions secured some tenants for plaintiff and upon occasion had collected some rents does not form sufficient basis from which alone such a confidential █ relationship would arise. No matters, extending over any considerable period of time, wherein confidential transactions, reliance upon the integrity, loyalty, good faith, judgment, or fair dealing of defendants were alleged or shown to have existed. So far as alleged or proved, the transactions referred to were business transactions handled as is commonly said "at arm's length." No weakness of mind is shown on the part of the plaintiff. It is not shown that she was easily persuaded or led into improvident business transactions, nor is it shown that any dominating mind overpowered or dictated any of the elements of the transaction. On the contrary, she refused to consider the advice of her son and sought independent advice and made investigations concerning the transaction.

The contract of exchange preceding and antedating the contract of sale and purchase of the Delphia Apartments contained a provision that the Gaddis Investment Company was authorized to act as agent of the other party to the exchange. It is settled law that one may not, without █ clearly disclosing to all interested parties such relationship, act as agent for both buyer and seller in the same transaction involving matters of discretion. It is difficult for an agent to press for and secure the highest fair price for both seller and purchaser in the same transaction. By

so attempting the agent puts himself into a conflicting position which he should avoid, "for where your treasure is, there will you heart be also," and "no man can serve two masters; for either he will hate the one, and love the other; or else he will hold to the one, and despise the other." Matt. 6: 21, 24. Yet notwithstanding this ancient admonition and the underlying reason for the rule and the tendency for one assuming the role of a double agency to act in bad faith toward one or both of his principals, it has come to be recognized law that "there is no legal objection to such double employment if both principals fully understand the situation and consent thereto." 2 C. J. 713, § 367.

The power and authority to act in this double capacity was written into the exchange agreement which both signed. The transaction, however, as finally consummated, did not result in an exchange of properties between the principals, the plaintiff, Susan K. Olson, and the defendant Laura M. Johnson; but in one wherein Peter Johnson took the property of Susan K. Olson upon the basis of the price fixed by her of the sum of $8,000, less the mortgage of $1,350, and Laura M. Johnson received another piece of property from Peter Johnson and gave Mrs. Olson a credit of $6,650 upon the purchase price of the Delphia Apartments agreed to be purchased by Mrs. Olson. While a double agency position always subjects one assuming such position to possible criticism and unless carefully guarded and faithfully performed may result in legal liability, under the pleading, the proof, and the findings and judgment of the trial court, we cannot say the dual position of part of the defendants was abused; in any event it does not appear. The authorities cited by appellant support the law as above stated, but the instant case does not upon its facts fall within the authorities cited.

It would serve no purpose to restate even a resume of the evidence. As to values of both properties in question, there was evidence from which the trial court could have found either a higher or a lower value for either of them. The market values testified to as to the apartment property

varied from around $24,000 to around $35,000, and that of the Euclid avenue property from about $8,000 to about $3,500. That the appellant knew something of the responsibility she was undertaking in the purchase of the apartment property is apparent from her own testimony and what was said to her by others, especially as shown by the testimony of her son and that of Mr. Backman. That it was a situation calling for rigid economy and careful and efficient management is manifest. Some expected and some unexpected or even unusual expenses may have arisen. That the best of judgment or management in the purchase or carrying out of the project was required or was not may be open to argument, but such does not furnish sufficient ground for disturbing the findings of the trial court. It was manifest that during the approximate three-year period between the date of purchase and the commencement of the suit there had been a substantial depreciation of the value of real estate in Salt Lake City, with an accompanying reduction of rental returns. During the period, very substantial changes have taken place as to values and conditions. We think the court was justified in finding laches and that a rescission at this late date would be inequitable. *Jones Min. Co.* v. *Cardiff Min. & Mill. Co.*, 56 Utah 449, 191 P. 426, 429; *Smith* v. *Smith*, 77 Utah 60, 291 P. 298.

Respondents urge that appellant is not entitled to rescission because she has made no tender or offer to return the property contracted to be purchased by her. Appellant does allege that since the execution of the contract of purchase she has requested of defendants that the "contract to purchase be cancelled and set aside, and that her properties be returned to her," and for an accounting, and that defendants have refused to cancel said contract or to return her property, or to account, and are threatening forfeiture because of default in payments. If the matter of failure of a tender of reconveyance of the property were the only thing standing in the way of granting relief, a court of equity might stretch the above pleading referred to into

a possible tender. No tender is made in specific terms and any construction sufficient to make a possible tender out of the language used would be attenuated. In view of the whole situation and the fact the case does not turn upon the question of tender, it maye be at least pertinent to remark that the pleading does not clearly bring the appellant within the rule, "that where, as here, the purchaser seeks to rescind and recover back money paid on the purchase price, as a condition precedent to the right of maintaining an action the purchaser must offer to restore the possession to the seller," as stated in the case of *Owens* v. *Neymeyer*, 62 Utah 580, 221 P. 160, 162, and quoted and affirmed in the case of *McMonegal* v. *Fritsch Loan & Trust Co.*, 75 Utah 470, 286 P. 635, 637.

We are of the opinion the findings of the trial court are supported by the evidence. That there is no reversible error in the record though much that is immaterial is **found** therein.

Judgment is affirmed. Respondents to recover costs.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.