SOBIN *v*. FREDERICK.

1. CHATTEL MORTGAGES—CONSIDERATION.

Where a salesman guaranteed the payment of a bill of goods which was charged to him by the seller, and he paid the account, a chattel mortgage given to him by the buyer as security for the debt cannot be said to be void for want of consideration.[1]

2. SAME—FRAUD—DURESS.

Plaintiff's claim that a chattel mortgage on his stock of goods was obtained by threats, duress, and undue influence, *held*, not sustained by the record, which shows that the mortgage was voluntarily executed to secure a past-due indebtedness to defendant.[2]

3. SAME.

Plaintiff's claim that his writing to the constable authorizing him to realize on the note and mortgage was obtained by fraud, threats, and intimidation, *held*, not sustained by the record, which shows that said writing was voluntarily given.[3]

4. CONSPIRACY—NO EX POST FACTO CONSPIRACY.

There can be no *ex post facto* conspiracy—to do that

---

[1]Chattel Mortgages, 11 C. J. § 67; [2]Id., 11 C. J. § 148; [3]Id., 11 C. J. § 502.

which has already been done, since the root principle upon which the law of conspiracy rests is a preconceived plan to unlawfully work some public or private wrong or injury by concerted action, originating in combination, either carried out by joint action or at least pursuant to a joint arrangement and understanding.[4]

5. APPEAL AND ERROR—CONVERSION.

In an action charging conspiracy and alleging that thereby defendants obtained a chattel mortgage on plaintiff's stock of goods and converted same, where the conspiracy was not shown and the mortgage was shown to be valid, the Supreme Court, on reviewing a judgment in favor of defendants, will not consider the claim of conversion further.[5]

6. CONSPIRACY—EVIDENCE—SUFFICIENCY.

In an action charging the mortgagee, constable, and purchaser of the mortgaged goods with conspiracy, where the undisputed evidence shows that defendants never met until after the mortgage was given, a *prima facie* case of conspiracy, justifying submission of that question to the jury, was not made.[6]

Error to Wayne; Merriam (De Witt H.), J.   Submitted January 26, 1926.   (Docket No. 166.)   Decided December 8, 1926.

Case by Fred Sobin against Carl A. Frederick, Philip Donon, and Ralph C. Paul for conspiracy.   Judgment for defendants *non obstante veredicto*.   Plaintiff brings error.   Affirmed.

*John C. Alexander* and *Leopold Mayer*, for appellant.

*Wurzer & Wurzer* and *Herman A. Schmier*, for appellee Donon.

*John McNeil Burns* (*Fred Wynn* and *Henry C. Hart*, of counsel), for appellee Paul.

STEERE, J.   On April 2, 1921, plaintiff voluntarily

[4]Conspiracy, 12 C. J. §§ 5, 7 (Anno); [5]Appeal and Error, 4 C. J. § 2541; [6]Conspiracy, 12 C. J. § 234.

executed and delivered to defendant Frederick a chattel mortgage on his stock of goods, fixtures and merchandise located at 4911 Beaubien street in the city of Detroit. The instrument was in customary form with the requisite statutory affidavit attached, signed and sworn to by plaintiff. In it he introductorily recited "I, Fred Sobin, party of the first part, being justly indebted unto Carl A. Frederick, party of the second part, in the sum of eight hundred seventy-six and 92/100 dollars, has, for the purpose of securing payment of said debt, and the interest thereof," etc. In the condition clause of the mortgage the indebtedness is again stated in full followed by the agreement "to pay the same accordingly. But if default be made in such payment" the mortgagee is authorized to sell the mortgaged property "at public auction, after the like notice as is required by law for constables' sales," etc. The instrument also contains the usual concluding provision which authorizes a mortgagee "at any time when he shall deem himself insecured," or for other stated reasons, to take possession of the mortgaged property and retain it in some convenient place until the indebtedness secured by it becomes due and then dispose of it "in the manner above specified."

Defendant Frederick was a salesman for the T. H. Phelps Company, candy manufacturers of Cleveland, Ohio, and sold to plaintiff a bill of goods amounting to $1,143.55 early in December, 1920. The Phelps Company declined to ship the goods unless Frederick became responsible for the amount. Edward Johnson, president of the Phelps Company, testified that they did not consider Sobin's credit sufficiently good to warrant them shipping him goods to that amount, but filled the order at Frederick's solicitation, on his guaranteeing the account. The account was charged to Frederick on their books and had been fully satisfied.

Plaintiff did not pay this account when it became due and failed to keep his promises later but did make payments under pressure which reduced the account to $658.55 before the mortgage in question was given the following spring.    Frederick was then insisting that the account be paid up or security given therefor.    Plaintiff states he replied "All right, if you give one month, I could pay the $650, I give mortgage, and I give mortgage."    Another creditor was then pressing a claim of $200 and that was also discussed. Under some arrangement, not fully admitted by plaintiff, that amount was added to the mortgage, making the same $858.55.    The attorney who drew the mortgage testified that the parties discussed it among themselves at the time the mortgage was executed and they both directed him to make it for that amount.

Plaintiff admits his business was not profitable at that time.    He was trying to sell it to prospective purchasers and so told Frederick who helped him make an inventory for that purpose.    That was about the time the bottom dropped out of a runaway sugar market following the close of the last war, disastrously disturbing business conditions in certain lines.    In his explanation of the money stringency which then befell him, plaintiff said:

"You know business bad, you know after war sugar drop, everything mixed up, you know.    *    *    *    he (Frederick) afraid something like that, because lot of people go bankrupt.    *    *    *    Bad, bad business, at the time I give the mortgage.    *    *    *    I make little sale to pay my expenses, pay little bill, you know, come before Phelps Candy Company, all my money of this sale—from the sale go in my expenses."

Plaintiff's prospective sale did not materialize, and apparently considering himself insecure under the unprofitable condition of plaintiff's business, Frederick took steps to either collect the debt or conserve his security.    To that end he made inquiry for a constable

and engaged the services of defendant Donon, to whom he turned over the chattel mortgage with instructions to collect the debt or take possession of the property under authority of the mortgage. That was his first meeting with Donon, who, pursuant to instructions, went to plaintiff's place of business, on April 18th or 19th, informed him of his mission, requested payment of the mortgage, showed him the instrument and told him that if he did not pay the indebtedness he would have to take possession as authorized by the mortgage. Not obtaining payment, he asked for the key of the place. Plaintiff then refused to let him have it but finally proposed that they first go down to Frederick's office, to which Donon assented. Plaintiff thereupon locked his store and they went there together. After interview with Frederick and his attorney, plaintiff delivered to Donon a key to the store and left him in possession of the property. He then busied himself in trying to dispose of his stock and business to claimed prospective purchasers and the place was not closed until they refused to buy after looking it over. After further interviews with Frederick and his attorney, plaintiff signed and delivered to Donon the following written authority:

"4/21/1921.

"PHIL DONON, Constable:

"I hereby authorize you to realize on the note and mortgage as if they were past due. I do this for saving expense of storage and further depreciation of value of goods.

"I also give you possession of the store at 4911 Beaubien until the tenth day of May, 1921.

(Signed) "FRED SOBIN."

Donon then closed the place, and, on April 21st, posted or had posted regular notices of mortgage sale for April 30th, after which, as he testified, Frederick took an inventory. At the time and place for which the sale was noticed the mortgaged property was sold

at public auction to the highest bidder.    An auctioneer was employed to conduct the sale.    While it was in progress, with quite.a crowd in attendance, as defendant Paul testified, he drove by in his automobile, saw the notice and learned that the sale was going on. He testified that his business was that of a commercial auctioneer and stock buyer; he had followed that calling for 20 years, buying and selling bankrupt stocks, and had a large warehouse which he used in connection with his business.    His undisputed testimony is, in part, as follows:

"I first find out there was going to be a sale of the Sobin Candy Company goods the morning of the sale. I found out by passing with my automobile.    I see a crowd in front of the store waiting to get in and I recognized the buyers.    I recognized some people in the crowd as being—buyers.    As people who usually bought that kind of goods.    It is not a fact I went there and took some buyers of my own along with me.    I had never seen the stock before.    After I first got into the place.    I waited about six minutes before they opened the door; there was a sign on the door, 'trust mortgage sale.'  *  *  *  I ascertain what was in the place so as to be able to bid on it by the inventory that was in the place.  *  *  *  I am not sure, it was $2,700 or $2,300, about that figure, between $2,300 and $2,700.  *  *  *  The purchase price of it I do not remember unless it says on the bill of sale, the bill of sale says, $1,032.72—$1,037.72— that is what the amount was.    I gave him about, I think it was $75 in cash, or $100 in cash at the time of the sale, when I made the bid—that is all the money I had with me; then I went down to the bank and drew $1,000 and give him the difference."

On receiving full payment of the amount bid, Donon executed and gave to Paul a bill of sale acknowledging the receipt of $1,037.72 for the property, describing the same, and promptly turned over the exact amount he had received to Frederick.    Paul thereafter removed the property to his warehouse, and, being un-

able to dispose of it by private sale, as he testified, subsequently sold it by auction at a loss.

Plaintiff thereafter brought this action of trespass on the case against the three defendants, charging them with having conspired together and entered into a scheme to cheat and defraud him of his goods, and convert them to their own use by "a fraudulent, illegal, and wicked scheme and plan" detailed in outline, with direct allegations that Frederick, by threats to close up his place of business because of his indebtedness, intimidated him into executing the mortgage, with which Constable Donon soon came to his place of business and claimed to be authorized to take possession under the mortgage, demanding possession and threatening to close it up, whereby he was deceived and intimidated into giving the written authority quoted, their conspiracy terminating in a fraudulent and illegal sale of his entire stock to Paul.

Defendants severally appeared by different attorneys and pleaded the general issue. After considerable delay in preliminary proceedings the case was brought to trial before a jury. During the trial and at close of the proofs, the court denied the several motions and requests of defendants for a directed verdict in their behalf and tentatively submitted the case to the jury under the statute, resulting in a verdict in plaintiff's favor. A motion was thereafter made by defendants for a judgment *non obstante veredicto*. After hearing argument, the court filed a written opinion granting said motion, saying in part:

"The undisputed evidence in this case shows that the plaintiff voluntarily executed his chattel mortgage to the defendant Frederick, and that he later executed a further paper and delivered it to the defendant Frederick, authorizing and directing the sale of the property under the chattel mortgage; and that neither the defendants Donon nor Paul had anything to do with these acts, or any part of the same; that there

is no evidence of conspiracy between these defendants whatsoever, neither to do an unlawful act nor to do a lawful act in an unlawful manner."

Judgment *non obstante* was thereafter entered in favor of defendants.

It is first urged under plaintiff's assignments of error that "No valid mortgage was executed, because there was no consideration therefor, nothing being due Frederick at any time" and the same was "obtained by threats, duress, undue influence." During the cross-examination of plaintiff his counsel said to the court when interposing an objection, "the whole question involved is whether Mr. Frederick ever gave anything, gave any consideration for the mortgage, that is the basis of this whole case." In support of that proposition plaintiff testified he bought the bill of goods he mortgaged to Frederick from the T. H. Phelps Company and received from it a bill for the same, never bought any goods from Frederick and never owed him anything. Whatever significance that situation might have, plaintiff knew those facts as well when he voluntarily gave Frederick the mortgage as when he was testifying. He did not claim to have ever communicated with or made any payments to the Phelps Company, or known any one connected with it except Frederick, either before or after this account became due. He gave his order for the goods to Frederick, made his belated partial payments, promises and requests for extension of time to him, and fully recognized in various ways his authority to collect the debt, to secure which he gave him the mortgage in consideration of extension of time in which to perfect a claimed prospective sale of his business. The goods were in fact shipped to plaintiff by the Phelps Company on Frederick's credit, and when past due charged by it to Frederick who was not only authorized to collect as agent but also the

real party in interest, and under the undisputed facts empowered to take the mortgage in his own name to secure payment of the indebtedness it was his right and duty to collect.

Plaintiff's claim that the writing of April 21, 1921, which he gave Donon, authorizing him to realize on the note and mortgage to save depreciation, storage, etc., was obtained by fraud, threats, and intimidation on the part of Frederick and his attorney, resolves itself by his own testimony into nothing more than a threat or contingent proposal to remove the mortgaged goods to some convenient place for storage to be there retained at his expense until the debt fell due, as authorized by the terms of the mortgage. He states that when they closed the store on that date and he "wanted to find out what the trouble was," they told him Frederick was boss; that at an interview with Frederick and his attorney the latter proposed he sign that paper, to which he demurred and said he wanted more time and would go to a lawyer, and the attorney then told the constable to go ahead and move the stock from the store to another place. He testified this "scared" him, and he figured it was better to sign, as he did not like moving his goods, and so he signed it. Frederick had no right under his mortgage to use the building for storing the mortgaged stock he had seized. He did have a right under the mortgage to take possession of and store it elsewhere at plaintiff's expense until sale under the mortgage could be had. It is not claimed that Donon took any part in that proceeding. The testimony is undisputed that Donon never met or knew of Frederick or plaintiff until the day Frederick gave him the mortgage with directions to collect the debt or seize the mortgaged property, and that Paul never met any of them until he attended the auction sale, and, as highest bidder, bought it.

In form and allegations, plaintiff's action is planted on the theory of a conspiracy. There can be no *ex post facto* conspiracy—to do that which has already been done. The root principle upon which the law of conspiracy rests is a preconceived plan to unlawfully work some public or private wrong or injury by concerted action, originating in combination, either carried out by joint action or at least pursuant to a joint arrangement and understanding.

Under the introductory allegation in his declaration that "by a fraudulent, illegal and wicked scheme and plan * * * each and all of the defendants" took possession of and converted plaintiff's stock of goods to their own uses, the contention is made that the question of unlawful conversion is involved, and even if a conspiracy in law is not shown, plaintiff would be entitled to a judgment for conversion against one or all of them. Under the theory and wording of the declaration, as we read it, conversion is but an incident, or result, of the alleged conspiracy. In urging that contention, plaintiff's counsel said in the trial court that if proof of conspiracy failed, he was suing defendants "jointly for the conversion of this stock of goods for the reason Frederick had no right to the mortgage," which is also urged here. Having found the mortgage valid, we need not consider the claim of conversion further. There being no proof of what disposition Frederick made of the proceeds of the sale, that question is not before us, and is therefore passed without prejudice.

Plaintiff's proofs wholly fail to make a *prima facie* case of conspiracy to carry that claim to a jury.

The judgment will stand affirmed.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.