293 P.2d 700

Rex HOLLAND, Administrator, et al.,
Plaintiff and Appellant,

v.

COLUMBIA IRON MINING CO. et al.,
Defendants and Respondents.

No. 8237.

Supreme Court of Utah.
Feb. 16, 1956.

Rawlings, Wallace, Roberts & Black, Salt Lake City, for appellant.

Calvin A. Behle, Dickson, Ellis, Parsons & McCrea, E. Ray Christensen, Gustin, Richards & Mattsson, Fred H. Evans, Salt Lake City, for respondent.

JONES, District Judge.

From a summary judgment dismissing the corporate defendants from this action, appellants bring this intermediate appeal.

The six causes of action set out in the amended complaint charge the corporate defendants (respondents) with conspiring with one of the individual defendants, and their alleged participation in and aiding said individual defendant in the fraudulent concealment of the amount being paid him for his one-fourth interest in certain mining claims. The record consists of the depositions of all the individuals who had anything to do with the transaction, affidavits, together with the pleadings. The respondents include the Columbia Iron Mining Company (hereafter referred to as Columbia) and its affiliates.

The question presented is as to whether any genuine issue as to any material fact exists. Rule 56(c), Utah Rules of Civil Procedure. If there be no such issue, then the judgment must be affirmed. Otherwise, the action must be reversed and the respondents required to stand trial along with the individual defendants.

The preliminary negotiations between the parties appear to have been conducted without any unusual incident or significance. Co-tenant Moreton, in behalf of himself and the other owners of mining claims, had opened discussions with Columbia concerning a sale of these properties. A selling price of $387,500 was asked, $100,000 for the Hollands and $287,500 for the Moretons. Moreton had been advised that Columbia's policy was to lease such properties on a tonnage basis, but he insisted on selling. When Columbia ascertained

that the claims had not been perfected, Moreton was advised that patents would have to be obtained and abstracts of title submitted for examination. Moreton was further advised that Columbia, while these things were being accomplished by the sellers, would undertake a magnetometer examination of the property. The respective parties then proceeded to do these things. Columbia dispatched a crew of men out onto the ground for the purpose of satisfying itself as to the tonnage of iron ore in place, and its attorney prepared a draft of a contract. Moreton proceeded with the necessary steps to obtain patents and ordered abstracts of title. Several months elapsed. Then one of the appellants wrote Mr. Mathesius, Columbia's president, requesting that the proposed sale be cancelled because Moreton had misled plaintiffs into accepting $100,000 for their interests when their properties were actually worth several times that amount. When Mathesius received this communication he looked up Moreton, exhibited the letter, and demanded an explanation. Moreton showed Mathesius an agreement of sale signed by all of the claimants wherein it was stipulated that all interests (including Moreton's) were to be offered for $133,333.33, on a tonnage basis, Moreton to have one-fourth of that amount plus anything he could obtain in excess of the $100,000. These documents did not satisfy Mathesius. He informed Moreton that further proof would have to be sub-mitted that the Hollands were satisfied. Moreton stated that such proof would be obtained. (Mathesius never did answer the Holland letter.) At this meeting, or about the same time, Moreton informed Columbia that it would be necessary that two sets of closing papers be prepared, one for the use of the Hollands covering a three-fourths interest, and one for the signatures of the Moretons covering a one-fourth interest. (A month elapsed.) Then Columbia received a letter signed by all of the owners of the three-fourths interest wherein it was recited that said parties were satisfied to take $100,000 for their interests and that Moreton might sell his portion "for whatever price you and he may agree upon." This communication satisfied Columbia. A month later, Columbia received another communication from the Hollands, the body of which read as follows:

"We reaffirm our letter to you of October 16, 1948, with respect to the offer made by us to your company for the sale of our interest in and to the M & H Claims at Desert Mound for the sum of $100,000 cash.

"We made this offer to sell our interest for this sum, free and clear of all encumbrances and lawful claims whatsoever. Patent on these claims has now been issued and we hope for an early acceptance of our offer.

"An interest in these claims is also held by Arthur E. Moreton, and it is

no concern of ours as to when and to whom he may sell his interest or at what price or upon what terms."

The company's attorney then proceeded to prepare the necessary deeds, checks, and receipts, and Moreton was asked to deliver the abstracts of title for examination. In the meantime the company had completed the tonnage survey. Finally, a figure of $387,500 was agreed on, Moreton stipulating that $100,000 of this amount was to be paid in cash to the Hollands for their three-fourths interest, the remainder to go to Moreton (and members of his family) in installments. Satisfied now that the Hollands understood what they were doing, Columbia's officers laid plans to close the transaction. Moreton was notified to assemble all of the sellers in his office on a day certain for the purpose of consummating the sale. All of the parties then gathered in Moreton's offices. (Another month had elapsed.) The Hollands there executed the deed which had been prepared for their signature, the receipt, and accepted a check for $100,000. The parties differ in some particulars as to exactly what was said and done at this meeting. Respondents' officers maintain that certain of the documents were read aloud. Appellants deny this. Be that as it may, after the transaction was completed as to the Hollands, Columbia's negotiators next completed their transaction with the Moretons. The same routine was carried out, the papers signed, and a check in the sum of $71,875 (the first installment on $287,000) was delivered and accepted. The meeting then adjourned.

■ Do these facts present a justiciable controversy involving a fraudulent conspiracy and concealment on the part of respondents? We think not. Insofar as respondents are concerned, there is nothing in this record to show that they intentionally participated in the furtherance of any preconceived common design and purpose to defraud the appellants. See State of Missouri ex rel. and to Use of De Vault v. Fidelity & Casualty Co. of New York, 8 Cir., 107 F.2d 343, quoting from 15 C.J.S., Conspiracy, § 2, p. 997; Reitmeister v. Reitmeister, 2 Cir., 162 F.2d 691; Sobin v. Frederick, 236 Mich. 501, 211 N.W. 71; Neblett v. Elliott, 46 Cal.App.2d 294, 115 P.2d 872.

■ But appellants assert that they are entitled to the benefit of certain inferences to be drawn from the facts. They argue that because Moreton and Mathesius did not (in their depositions) fix the exact time when their acquaintanceship began; the fact of their membership in the same club; that Mathesius did not answer Holland's letter; and that separate deeds and papers were drawn for the co-tenants to sign; it can be reasonably inferred that Moreton and Mathesius (as agent of Columbia) were conspiring together to defraud them. But we do not feel that appellants can be permitted to draw favorable inferences from these facts. Inferences

are made for the purpose of aiding reason, not to override it. Maggio v. Zeits, 333 U. S. 56, 68 S.Ct. 401, 92 L.Ed. 476. Inferences are nothing more than probable or natural explanations of facts. 20 Am.Jur. 164, citing, inter alia, Kenney v. Washington Properties, 76 App.D.C. 43, 128 F.2d 612, 146 A.L.R. 1. And see Neblett v. Elliott, supra. Common sense and reason dictate that evil inferences should not be permitted to be drawn from routine business transactions where there are no other circumstances. To hold otherwise would throw the door open for an attack on each and every transaction that one might enter into. Every vendor who might feel aggrieved because he wasn't paid enough money for his property should not be permitted to come into court and have his case submitted to the trier of the facts merely because it is subsequently ascertained that he made a bad bargain. And those who are willing to sign most anything in order to obtain money should not be permitted to lightly cast aside these solemn documents and vitiate transactions which have long since been consummated.

The trial court was right in summarily dismissing the respondents from the action for the reason that there was and is no genuine issue to resolve as to them. But nothing herein contained should in any respect be construed as a determination of any of the issues as between the appellants and the individual defendants.

Affirmed.

HENRIOD, J., concurs.

CROCKETT, Justice (concurring).

I concur in the opinion of Judge Jones, and as a supplement thereto, set forth a further analysis of the case as it appears to me. The plaintiffs' claim that the Columbia Iron Mining Company participated in a conspiracy to defraud them in connection with the purchase of their interests in the mining claims stems from the fact that plaintiffs received only $33,333.33 each for their respective one-fourth interests therein, whereas, A. E. Moreton, who had acted as their attorney, and who negotiated the deal for them, received $287,000 for his one-fourth interest in the same claims. The charge made is that as a result of deceiving them and concealing the facts about the true value and purchase price being paid for the claims, plaintiffs were induced to part with their property for much less than it was worth, and less than they would have done had they known the facts.

The depositions of all concerned in the transaction were taken. Upon the basis thereof the corporate defendants made a motion for a summary judgment, which was granted as to them. This intermediate appeal is taken from that ruling. It should be kept in mind that although the principals dispute each other as to essential facts in their depositions, in reviewing the order, the plaintiffs, against whom it was granted, are entitled to have us consider the evidence

308

and every inference fairly arising there-from in the light most favorable to them.[1]

If Columbia is to be held responsible, it is upon the conduct of its president Walter Mathesius, in collaborating with Arthur E. Moreton. It, therefore, becomes necessary to set forth what the plaintiffs claim as to the latter's conduct in order to provide a background upon which to analyze the part Mathesius played therein.

It appears that after conversations with Mathesius, Moreton contacted the Hollands at Cedar City with respect to the patenting of the mining claims in question which plaintiffs had previously located with a view to eventually arranging a sale; that he acted as their attorney in doing so; that he advanced the necessary costs involved in the patenting and became a one-fourth owner; that he acted for his co-owners in negotiating a sale of the claims to Columbia; that Moreton bore a fiduciary relationship to the Hollands[2] and, therefore, owed them a duty to make a full disclosure of facts;[3] that he seems to have followed a carefully studied plan to conceal from the Hollands that he was getting $287,000 for his one-fourth interest, whereas, he was getting for them only $33,333.33 for each of their one-fourth interests; that meanwhile he warned the Hollands not to talk to anyone else about the matter.

The above facts appear from the Hollands' testimony and are supported by other circumstances shown: that the letters (later referred to herein) which Mathesius requested and which Moreton presented to the Hollands for them to sign, carefully avoided any recitation of the price per ton or the actual purchase price being realized from the claims; the fact that when Columbia furnished papers handling it as one transaction, Moreton returned them and requested two separate conveyances which would have the effect of concealing from the Hollands the full consideration being paid; the fact that the two separate conveyances were used and the transaction at the closing was so managed that the plaintiffs first received their check for $100,000 about which they quite naturally would be somewhat elated and preoccupied while the Moreton phase of the transaction was handled.

Mathesius can be held legally responsible for conspiracy to defraud the plaintiffs

1. Morris v. Farnsworth Motel, Utah, 259 P.2d 297, 298; Strauss v. Strauss, 90 Cal.App.2d 757, 203 P.2d 857, 858.

2. Where an attorney client relationship exists, parties have been held to sustain the relation of trustee and cestui que trust, and their dealings with each other are subject to the same intendments and imputations as obtain between other benefi-

ciaries. 5 Am.Jur. 286 n. 8, Attorneys at Law sec. 46; 37 C.J.S., Fraud, § 16, p. 247. See Omega Investment Co. v. Woolley, 72 Utah 474, 271 P. 797, as to where a co-owner acts as agent, see Shaw v. Shaw, 160 Cal. 733, 117 P. 1048.

3. See Peterson v. Budge, 35 Utah 596, 102 P. 211, 216; Matter of Danford, 157 Cal. 425, 108 P. 322, 324.

only if there existed a wrongful scheme to cheat them or deprive them of their property in connection with which he wilfully did or omitted some act purposed toward the furtherance of such wrongful scheme.[4] It is not necessary, however, that it be shown that he or his company profited therefrom.[5]

The following are the facts and circumstances pointed to as having any bearing upon, or giving any color to the claim that Mathesius assisted Moreton in deceiving the Hollands:

(1) Mathesius and Moreton belonged to the same club.

(2) They discussed these claims and the possibility of their purchase by Columbia before Moreton had contacted the Hollands or had any interest therein.

(3) Mathesius told Moreton that he might suggest that the claims be patented so they would be in a position to do business.

(4) Pursuant to these conversations, Moreton contacted the Hollands at Cedar City respecting the claims.

(5) Mathesius received a letter from Rex Holland dated September 14, 1948, advising that he thought Moreton was deceiving them and that the Hollands wanted three-fourths of the proceeds of the sale, which they considered to be their fair share.

(6) After having had prepared the agreement to purchase and the deed made out as one transaction, reciting the full consideration, at Moreton's request and without advising the Hollands, Mathesius withdrew such documents and had two separate sets of papers made out which would have had the effect of not revealing to the Hollands the full consideration paid for the claims.

(7) Mathesius either knew or should have known that Moreton was a fiduciary of the Hollands and as such had a duty to fully inform them of the facts concerning the transaction he was handling for them. This is particularly so because Mathesius was conferring with his attorney Mr. Heald right along about the matter; and upon the basis of Rex Holland's letter is charged with knowledge that Hollands were claiming that Moreton was concealing facts from them.

(8) Mathesius himself stated that upon the basis of his then knowledge and upon advising with his attorney, Mr. Heald, they decided that the Hollands should know the full facts before the deal was closed.

(9) To accomplish the above purpose he requested a letter indicating that the Hollands knew the facts and were satisfied with the transaction, but accepted a letter which did not state the purchase price, nor the price per ton, and which he admits noticing omitted doing so.

4. 15 C.J.S., Conspiracy, §§ 2, 9, pp. 996–1005, passim.

5. Anderson v. Thacher, 76 Cal.App.2d 50, 172 P.2d 533, 546.

(10) Mathesius participated in so handling the final transaction that Hollands received their $100,000 check, about which they were elated and preoccupied while Moreton's phase of the transaction was consummated.

(11) The revenue stamps were affixed to the deeds without being seen by the Hollands.

(12) When Mathesius was interviewed by an attorney, Mr. Spanos, who said he was going to sue Moreton for the Hollands, Mathesius immediately became defensive of Moreton, volunteering the advice that he didn't think Spanos had a case, as Moreton was not acting as attorney but as co-owner. The latter fact he reiterated in his deposition on two occasions.

(13) Mathesius appears to have lacked forthrightness in his testimony. One of the plaintiffs' attorneys, Mr. Pollack, talked to him by long distance, asking certain questions concerning the transaction. Upon being advised that the conversation was recorded, Mr. Mathesius immediately sent a special delivery letter and a telegram forbidding any use or publication of the conversation. Upon his deposition, although his expressions indicate that he was indignant about the recording of his conversation, and he seemed to recall the facts surrounding it quite vividly, he persisted in answering that he did not recall whether Mr. Pollack had asked him any one of more than a dozen questions, nor the answers he made to them.

(14) Another matter may be given consideration as bearing on the overall picture: the unequal positions of the parties. It appears that the Hollands were poor folk, of little learning and were inexperienced in business. All except Rex were of advanced age. Accordingly, immediate cash was of great importance to them. Those on the other side of the transaction were well educated, experienced and skilled in business, particularly such transactions as this, and with practically limitless resources behind them, all of these facts being known to Mathesius.

Plaintiffs argue that if in viewing the foregoing facts in the light most favorable to them there exists even "a slight doubt" as to whether Mathesius participated in furthering a fraud, the summary judgment must be reversed. This somewhat overstates the case for the plaintiffs. It is true, indeed, that a summary judgment is a drastic remedy which the courts are, and should be reluctant to use.[6] Yet it does have a salutary purpose in the administration of justice in not requiring the time, trouble and expense of trial, when the best showing the plaintiff can possibly claim would not entitle him to a judgment.[7]

6. Travelers Indemnity v. McIntosh, 112 Cal.App.2d 177, 245 P.2d 1065, 1068.

7. Zampos v. U. S. Smelting, Ref. and Mining Co. (Anderson v. U. S. Smelting, Ref. & Mining Co.), 10 Cir., 1953, 206 F.2d 171.

Viewing the evidence in the light most favorable to the plaintiff does not mean that the court should pick out all of the aspects thereof favorable to supporting plaintiff's claim and ignore those that indicate to the contrary. It means that the court surveys the whole picture, takes into consideration facts and inferences therefrom tending to favor the plaintiff's position, and also considers other facts appearing which must be accepted as a matter of law, and weighs the whole matter against the background of legal precepts bearing on the problem. If when so viewed, reasonable minds could make findings that would make out a cause of action in accordance with the plaintiff's claims, summary judgment should not be granted; on the other hand, if it appears to the court that reasonable minds could not make findings which would establish a cause of action for the plaintiff, then the summary judgment is proper.

Directing attention to the various matters enumerated from 1 to 14 above, which are suggested as indicating Mathesius' complicity in a conspiracy to defraud plaintiffs: it will readily be observed that most of the points listed are obviously reconcilable with right conduct on his part. In the event of a trial, the burden would be upon the plaintiffs to prevail by a preponderance, or greater weight of the evidence. This cannot be done upon circumstances which are equally reconcilable with right as with wrong conduct.[8] I think it true that if some one or more of the facts could reasonably be regarded as definitely linking Mathesius with such a conspiracy, then all of the facts might be considered in analyzing his conduct in connection therewith. It is my purpose to discuss only those matters concerning which it seems to me that there may be some possibility that could reasonably be interpreted as indicating that Mathesius wilfully assisted in furthering a conspiracy to deceive and cheat the Hollands.

Point 5 is the first to warrant scrutiny in that regard. It relates to Mathesius' receipt of Rex Holland's letter of September 14 and the fact that he failed to answer it. The first observation to be made is that the inquiry here is not as to morals, ethics, or social amenities, but strictly as to Mathesius' legal duty and whether there was a violation thereof. It may be that it would have been considerate to have at least answered the letter, but Mathesius was under no legal duty to do so. Had he elected to make any statement concerning the matter, he would have been obliged to speak the whole truth,[9] but in the absence of any fiduciary relationship, he could remain silent.[10] A purchaser is under no obligation to tell his seller of facts concerning the value of the latter's property.[11] Unless

8. Alvarado v. Tucker, 2 Utah 2d 16, 268 P. 2d 986, 988.
9. 23 Am.Jur. 860, 55 Am.Jur. 564.
10. Annotation, 56 A.L.R. 429, 432–438.
11. Ibid.

one already has some basis for suspicion, there does not appear to be anything either unusual or unnatural in the fact that Mathesius went immediately to Moreton, with whom he had been dealing, instead of in effect "going around him" and entering into the arrangement requested by Rex Holland to assist the Hollands in their dealings with Moreton.

Point number 6 is the only one made by the plaintiffs which gives me any real concern as to whether it reasonably could be found that Mathesius was wilfully assisting Moreton in deceiving the plaintiffs. After Columbia had prepared the agreement to purchase and deed showing the co-owners as grantors and reciting the full consideration in one transaction, at Moreton's request, and without advising the Hollands, Mathesius withdrew such documents and had prepared two separate sets of papers. Moreton gave Mathesius the excuse that he did not want to join in warranting title to Hollands' interest, the very title he had just obtained the patents for. It does seem that this was but a pretext which ties in with Rex Holland's complaint that Moreton was misrepresenting facts to them and which should have raised Mathesius' suspicions as to such matter, and may well have done so as indicated by Mathesius' conduct presently to be discussed.

Arising out of his knowledge of the circumstances mentioned above in connection with points numbered 5 and 6 Mathesius went to Moreton for an explanation. The latter exhibited to him an Option signed by the Hollands that Moreton could purchase their interest in the claims for $100,000, and also an Agreement of Ownership which recited that if the claims were sold or leased on a tonnage basis for $133,333.33, that each should take one-fourth, and that if a greater amount was realized, then the excess should go to Moreton. Mathesius was not concerned as to the validity of these documents as between the parties, but they provided an informational basis for him to assume that the Hollands were satisfied with $100,000 as their share as was stated in the letters thereafter furnished to him.

In response to Mathesius' question as to the fairness of the transaction, Moreton stated in substance that in his opinion it was both right and fair, the "right" being based on the documents just mentioned, (Option to purchase and Agreement of Ownership) and the "fair" on the fact that he had kept the Hollands and Murie "in feed" many times over the past 20 years. The record does not disclose that there was any basis in fact for the latter statement. However, there is no indication that Mathesius then had any reason to know that it was not true. Nevertheless, after conferring with his attorney, Mr. Heald, it was decided that there should be a full disclosure of all the facts to the Hollands before the deal was finally closed. For that purpose Mathesius requested Moreton to get a statement in writing signed by the

Hollands that all parties to the transaction were completely satisfied, and for the same purpose, arranged that all interested parties should meet together at the closing of the transaction.

Point 9: The argument is made that Mathesius having decided that there should be a full disclosure of facts to the Hollands, it is incompatible with that purpose that he accepted a letter which did not recite the purchase price, nor the price per ton. From this it is reasoned that the contents of the letter itself are chargeable to Mathesius; that it is artfully drawn. to give the superficial appearance of fully advising the Hollands, but that it in fact carefully avoids reference to these vital matters. Contra to those contentions these thoughts arise: The Hollands, after having expressed apprehension about whether they were getting a fair share of the proceeds in the September 14th letter, signed the letter of October 16, 1948, which Moreton had presented to them, containing the statement as to tonnage "which we understand you estimate at 1.55 million tons," which "is entirely satisfactory to us," and further, "needless to say, Mr. Moreton may offer and sell his interest in said claims for whatever price you and he may agree upon, * * * and the entire proceeds will, of course, be his sole property, * *" Another letter of similar import was signed by them on November 20, 1948.

In this connection it is significant to remember that in Rex Holland's letter of September 14th he had said that Moreton misrepresented the price at 10 cents per ton, whereas, Hollands claimed it should have been 25 cents per ton. Twenty-five cents per ton was the price actually paid and the only evidence in the record is that this was equal to the highest price Columbia paid for iron ore to anyone in the area. The simplest mathematical calculation would have shown that 25 cents per ton x 1.55 million tons totals $387,500, which calculation Rex Holland could easily have made, as is apparent from the contents of the September 14th letter itself. These letters were signed without any direct contact from Mathesius or anyone associated with his company, so it cannot be supposed that there was any undue persuasion or deception on his part in procuring them.

Points 10 and 11 relate to alleged concealment of facts from the Hollands at the meeting when the transaction was closed. It is true that Mathesius seemed to be in general direction of the proceeding, but the conduct of the meeting, even as described by the Hollands, does not indicate any designed concealment by Mathesius. Ignoring the full exposition of facts and opportunity for questions, claimed by the defendants, because this is disputed by the Hollands, it still must be realized that Mathesius had seen the documents: Moreton's Option to purchase, the Agreement of Ownership, and the letters, all signed by the Hollands, indicating that the price they wanted for their share of the claims was $100,000; that they were entirely satisfied

with it; and that it "is no concern of ours" what Moreton gets for his share. In reference to the affixing of the revenue stamps: it was the grantor's duty to do so, which was done for them by Moreton. No fault can be found with Mathesius because he failed to do so or to advise the plaintiffs as to the amount thereof, as he had no legal responsibility in that regard.

Speaking generally with respect to the matters just discussed, the claimed deficiency in the letters and the manner in which the meeting was handled, this observation is to be made: under usual circumstances, all Mathesius would have had to do in such a transaction would have been to have Moreton bring deeds duly executed by the Hollands and pay the consideration therefor. Beyond that, Mathesius would not be concerned with the relationship or dealings between the co-owners. It was upon Mathesius' initiative that the letters were required and that the meeting was set up. His contention that this was done in conformity with his stated purpose that all parties should be fully advised rings true because the acceptance of the conveyance from the Hollands and the payment of their $100,000 check could have been handled in any number of other ways, and would have made a firm and unassailable transaction without any such letters or meeting.

It is undoubtedly now to be regretted that Mathesius did not insist that the letters be more explicit as to the purchase price and that the meeting was not handled so that it was indisputably clear that the Hollands knew the full details of what was going on. Mathesius had not warned them to silence. He had a right to assume that they were people of ordinary intelligence, and that they knew the facts which ordinary prudence would reveal to them.[12] It is to be kept in mind that it was Moreton who had been handling the transaction for them, not Mathesius. It does not seem improbable that the letters were designed so as not to reveal to the Hollands the full purchase price, nor that the meeting actually was handled in such a manner that they did not learn of it. But the letters were admittedly prepared in Moreton's office and taken by him for the Hollands to sign. The meeting was also held in Moreton's office. There was no reason why they should be looking to Mathesius as their adviser and confidant. They had not been encouraged to look upon Mathesius as such, and he bore no fiduciary relationship to them.

The idea of Mathesius' complicity in a conspiracy to deceive the Hollands is beclouded by the evidence that Moreton so engineered the transaction as to get an unconscionably large proportion of the total purchase price for his one-fourth interest in the claims. For obvious and understandable reasons an effort is made to link Mathesius, and the companies he represents, to this transaction. Color is given thereto, because Mathesius and Moreton belonged

12. Grenlac Holding Corp. v. Kahn, Sup., 106 N.Y.S. 83.

to the same club. If one surveys the picture through the eyes of suspicion with a preconceived notion that he connived with Moreton, it is possible to create a fabric of conjecture upon which to believe that Mathesius wilfully assisted Moreton in deceiving the Hollands. But it seems to me that if one is willing to indulge the presumption of right conduct, until some evidence definitely indicating the contrary is shown, which presumption Mathesius is entitled to have indulged in his behalf, his activities are understandable as the business-like carrying on of negotiations for his company for the purchase of the mining claims, for which the fair going price was paid, but except for the precautions he did take to protect his side of the transaction, refraining from going over on the other side to police the transaction by seeing that the sellers were dealing fairly with each other.

It is also to be observed that it seems somewhat anomalous that Mathesius' acts in the requiring of a statement in writing that the Hollands were satisfied, and the circumstances surrounding the holding of a meeting for their benefit, should be used as a basis for charging him with a conspiracy to defraud because they were not carried out with the thoroughness that hindsight now indicates would have been more efficacious to accomplish his purpose.

Further supporting the action of the trial court is the fact that the Hollands signed these letters for the purpose of having them delivered to Columbia with knowledge that that company was negotiating for the purchase of Moreton's interest in the claims; and that he was to get at least, as they put it, "a little more" for his share, and that Columbia was to consummate a deal and to act thereupon. In reliance on the statement in the letters that Hollands were entirely satisfied, Columbia paid out the full and fair market price for the total estimated tonnage of ore. This works an estoppel against the Hollands.[13] I agree, as plaintiffs argue, that if it were established that Columbia was a party to a fraud it could not invoke estoppel to assist in perpetrating it.[14] However, it is my opinion that there is no basis in evidence for implicating Columbia in fraud and the estoppel would apply against the Hollands.

I concur in affirming the judgment.

McDONOUGH, C. J., concurs in the opinion of the court as elucidated by the concurring opinion of CROCKETT, J.

WADE, Justice (dissenting in part).

Plaintiff, Rex Holland, in his own behalf and as administrator with the will annexed of his father, John G. Holland's estate, appeals from a summary judgment dismissing this action as to the corporate

---

13. 31 C.J.S., Estoppel, § 113, p. 362.

14. John Hancock Mut. Life Ins. Co. v. Markowitz, 1944, 62 Cal.App.2d 388, 144 P.2d 899.

316

defendants. I cannot agree that the showing sustains such dismissal as to the defendant Columbia Iron Mining Company.

Appellant contends that defendant, Arthur E. Moreton, while acting as attorney and agent for appellant, his father and William C. Murie, in perfecting their title, obtaining a patent and arranging for the sale of their interests in three mining claims, concocted a plan or scheme whereby he withheld information and misled them as to the amount received as the purchase price of such mining claims and thereby induced them to convey their interest in the property and accept a much smaller portion of the purchase price paid for the property than they were entitled to. He further contends that the defendant Columbia Iron Mining Company herein, through its president and secretary, with full knowledge of such scheme and all the facts surrounding the deal, conspired, and acted in concert with and actively participated in withholding such information from them, and in paying to Moreton $287,500 for his undivided one-fourth interest in such claims out of a total purchase price of $387,500; thus paying Moreton for his one-fourth interest $287,500 as against $33,333.33 to each of them for a similar interest.

A summary judgment is not sustained by a mere showing of facts which convinces the court that the facts are as claimed by the moving party. Under such motion the court does not try the facts nor determine what they are, but is concerned only with questions of law.[1] If there is any genuine issue as to any material fact the court must resolve it against the mover and deny the motion. Such judgment is proper only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no *genuine issue* as to *any material fact* and that the moving party is entitled to a *judgment as a matter of law*."[2] (Emphasis added.) The showing must demonstrate that the mover is entitled to a judgment as a matter of law. A "material fact" is one which affects the rights or liabilities of the parties. There is a "genuine issue as to any material fact" unless all facts which affect the rights or liabilities of the parties are so conclusively shown that there is not the slightest doubt thereon,[3] and in order to sustain such a judgment such facts must show that the moving party is entitled to a judgment as a matter of law. In deciding such a motion all evidence and the inferences to be drawn therefrom must be considered in the light most favorable to the party against whom

1. See 6 Moore's Federal Practice, 2nd Ed.R. 56.02 (10), 56.04 (2), 56.15 (1), (3) and (8) and the cases therein discussed and cited.

2. See Utah Rules of Civil Procedure, Rule 56(c).

3. See authorities cited in Note 1, and Peckham v. Ronrico Corp., 1 Cir., 1948, 171 F.2d 653; Landy v. Silverman, 1 Cir., 1951, 189 F.2d 80, 82; Doehler Metal Furniture Co. v. United States, 2 Cir., 1945, 149 F.2d 130, 135.

the judgment is sought. Such judgment should be granted only if the evidence precludes all reasonable possibility that the loser could by trial establish a valid claim.[4] On such motion the judge's function is analogous to determining whether to direct a verdict, but in some respects the evidence must be more conclusive for a summary judgment deprives the loser of a trial and usually such decision is made on the written record without the court hearing or seeing the witnesses and without the production of all possible witnesses. This is a drastic remedy with great possibility of saving time, but will neither save time or further justice unless granted only where it affirmatively appears that there is no reasonable possibility that the loser could establish a valid claim.[5] The burden of making such showing is on the party seeking such judgment for in the absence of such showing and convincing the court that such are the facts such judgment should be denied. So we must search the record to determine what facts may reasonably be found from the evidence and if we conclude that such facts are sufficient to entitle appellants to recover the judgment must be reversed.

Much of the evidence as to what occurred is not in conflict but there are serious conflicts in the evidence on some matters, and there are many serious conflicts as to the inferences which can reasonably be drawn from the facts, events and occurrences. I believe that if we view the facts, events and occurrences, and the inferences to be drawn therefrom, in the light most favorable to plaintiff, the conclusion is irresistible that facts could reasonably be found from the evidence which would support a judgment against the Columbia Iron Mining Company.

The gist of a civil action for conspiracy is the wrong done from the concerted actions of two or more persons in the accomplishment of a known scheme, design or purpose. It is not necessary that there be an express agreement; it is sufficient if there be a wrongful scheme, design or plan to accomplish a purpose to injure, damage or deprive another of his property, and that all of the parties to such conspiracy know of the scheme, design and purpose and actively participate in and work in concert with others to accomplish it. A mere tacit understanding between the conspirators is sufficient if there is knowledge of the wrongful scheme and concerted action to accomplish it.[6]

---

4. See Authorities cited in Note 1, and Bowers v. E. J. Rose Mfg. Co., 9 Cir., 1945, 149 F.2d 612, 615–616.

5. See 6 Moore's Federal Practice, 2nd Ed. p. 56.15 (2) and authorities cited in notes 1, 3 and 4.

6. See Volume 8A, Words and Phrases, Conspiracy, pp. 367–435, especially Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S.W.2d 344, 353; Horton v. Johnson, 192 Ga. 338, 15 S.E.2d 605, 613, 615; Lake Valley Farm Products v. Milk Wagon Driver's Union Local 753, 7 Cir., 108

To understand this case we must keep in mind some of the salient facts. The defendant Arthur E. Moreton, a lawyer officing in Salt Lake City, with experience in selling iron mining claims to the Columbia Iron Mining Company, met with the Hollands and Murie early in April of 1946, at Cedar City, and later he advanced the necessary funds and furnished legal services to obtain a patent in their joint names to three iron mining claims. For such services and funds they conveyed to him a one-fourth interest in such claims. They also gave him an option to purchase the other three-fourths interest in such claims for $100,000 so long as he "shall have negotiations for the sale of said claims actively pending." They executed an "Agreement of Ownership" that the Hollands, Murie and Moreton "shall henceforth each own an undivided one-fourth interest in and to each of the claims." That agreement further provides "that if said property shall be sold, leased or otherwise disposed of *on a tonnage basis* for a sum in excess of $133,333.33, the amount of such purchase price or receipts from lease or otherwise *on ore contained in said claims* in excess of

$133,333.33, together with one-fourth of said sum of $133,333.33 shall be paid by the purchaser to the said Arthur E. Moreton." (Emphasis added.) Had Moreton exercised his option to purchase or sold the claims "on a tonnage basis * * * on ore contained in said claims" he would have been entitled to all of the purchase price paid in excess of $100,000, but the evidence is clear and undisputed that he did neither and so those agreements are of no aid in supporting his claim that he was entitled to all the purchase price paid in excess of $100,000.

Moreton handled all of the negotiations for the sale of these claims to Columbia. He instructed the Hollands and Murie both orally and by letter that in order to avoid working against each other they should not mention or quote any prices. He drew all the letters and documents which they signed in connection with the sale except those drawn by the secretary of Columbia which were drawn after consulting with him and they adopted his suggestions. The Hollands and Murie consented and agreed that he should handle

F.2d 436, 441; Alaska S. S. Co. v. International Longshoremen's Ass'n of Puget Sound, D.C.Wash., 236 F. 964, 969; Browning v. Browning, 226 Mo.App. 322, 41 S.W.2d 860, 868; Mulholland v. Waiters' Local Union, 13 Ohio Dec. 342; Ballantine v. Ferretti, Sup., 28 N.Y.S.2d 668, 671; Kansas City v. Rathford, 353 Mo. 1130, 186 S.W.2d 570, 574; Ohlendorf v. Bennett, 241 Ill.App. 537; Lawlor v.

Loewe, 2 Cir., 209 F. 721, 725; Brumley v. Chattanooga Speedway & Motor-Drome Co., 138 Tenn. 534, 189 S.W. 775, 776; Kietz v. Gold Point Mines, 5 Wash. 2d 224, 105 P.2d 71, 74, 75. See also State v. Erwin, 101 Utah 365, 120 P. 2d 285, 308, which discusses and approves the above stated elements of a conspiracy.

the negotiations for the sale and arrange in their behalf all the procedure and details thereof. Plaintiff claims and testified that Moreton never did disclose to them the total price that was paid for the claims or the amount which he received, and that they did not know that amount until some years after the deal was closed. Plaintiff also testified that until after the deal was closed Moreton always represented to them that the total purchase price was arrived at by figuring the estimated tonnage of 1.55 million at only ten cents per ton, which would amount to a total purchase price of $155,000, and that he claimed the right to retain all in excess of $100,000 in addition to his one-fourth interest in payment for his services in finding a purchaser and arranging the sale, and that on such representations they agreed that he was entitled to retain such difference.

While negotiations for the sale of this property to Columbia were pending, Rex Holland wrote Mathesius, that corporation's president, a letter dated September 14, 1948, in substance stating: That the owners of the M & H claims had placed them with Moreton, who advised that the United States Steel Co. was interested in purchasing such claims. He asked for a postponement of the sale until more satisfactory arrangements between the owners and Moreton could be made. He stated that Moreton had led them to believe that the claims contained only 1.4 million tons of ore, that based on that tonnage they had agreed to accept $100,000 for their three-fourths interest, that such agreement would expire at the end of September, 1948, that since signing the agreement they had been advised that there was 3.5 million tons of ore in the property which was being offered at twenty-five cents per ton or a total of $875,000, which would net Moreton $775,-000 for a $700 investment. He asked for a postponement of the sale until after November 1, 1948, and that Moreton be notified that the sale was canceled, which would allow the agreement to expire, after which they could demand three-fourths of the purchase price, and requested an immediate answer.

Mathesius never gave Rex an answer to this letter but visited Moreton and read the letter to him. Moreton showed him the option to purchase and the Agreement of Ownership, and Mathesius testified that he concluded that Rex was not telling the truth. Mathesius told Moreton that before the deal was closed Mathesius must be satisfied by a statement from them in writing that the other owners were then satisfied with the deal whereby they were to receive only $100,000 for their three-fourths interest in the claims. Moreton testified that he never told the Hollands and Murie the amount which he was getting for this sale in dollars and cents and that Mathesius never requested him to tell them that, but he claims he told them that the tonnage was estimated at 1.55 million tons at twenty-five cents per ton. Moreton further

claims that Mathesius said to him that he wanted them to ultimately know the total purchase price being paid for the property, and he claimed that this was fulfilled when the deal was closed.

After this letter was received by Mathesius and not answered, Moreton prepared and the Hollands and Murie signed a letter offering to sell their interests in these claims to the Columbia Iron Mining Company, dated October 16, 1948. It stated that the signers understand that the sale is awaiting issuance of the patent and that they understand the tonnage is estimated at 1.55 million tons, that they have submitted an offer to sell their three-fourths interests for $100,000 cash which "is entirely satisfactory to us," that being without funds to secure the patent and pay the costs incidental thereto they asked Moreton "to secure such patent. at his sole cost and expense in return for an interest. Needless to say, Mr. Moreton may offer and sell his interest in said claims for whatever price you and he may agree upon,. * * * and the entire proceeds therefrom will of course be his sole property, * * *" A separate offer to sell bearing the same date as that letter was prepared by Moreton and signed by them and sent to the company. Another letter of similar import was prepared by Moreton and signed by the Hollands and sent to the company bearing date of November 20, 1948.

The sale of these three claims was negotiated as one transaction to transfer all four separate undivided one-fourth interests for $387,500; this price was arrived at by an estimated 1.55 million tons at 25 cents per ton. Originally the company submitted to Moreton one set of papers covering all four interests. The company never considered or offered to purchase Moreton's one-fourth interest without purchasing the other three-fourths interests in the same transaction. On Moreton's suggestion two separate sets of papers were used in closing the deal, one covering the Hollands' and Murie's interests and the other covering the Moretons' interest. He claimed that he made that suggestion not to prevent them from learning the total purchase price but to avoid warranting the title of the three-fourths interests not conveyed by him. This. was plainly but a feeble excuse because it was the very title Moreton himself had just perfected; and furthermore it is doubted that two separate sets of papers were necessary for such purpose. By using two separate sets of papers the plaintiffs could best be prevented from learning the total purchase price paid for the property. There is no question but that Moreton could not have accomplished his purpose in deceiving the Hollands without the help of Mathesius. The record also discloses that the defendant companies paid to Moreton two other large sums for mining claims, one in which he personally received $250,000, and another $50,000 transaction of which Moreton personally received $22,000 which facts give further weight to the like-

lihood that Mathesius was actively conniving with and assisting Moreton.

For the closing of the deal all the parties met together in Moreton's office on December 20, 1948. Mathesius and Heald, the president, and secretary, represented Columbia, and they produced the two sets of papers which they had previously prepared. Moreton, Mathesius and Heald each testified that prior to this meeting Mathesius had stated that since none of the papers which had been signed or were to be signed by the Hollands and Murie contained any statement which disclosed the total purchase price of the claims or the amount which Moreton was to receive, or the price per ton of ore by which the purchase price was determined, that this situation called for a complete disclosure eventually of all of these facts to them. However, all of defendants' testimony shows that after all the parties were assembled in Moreton's office on December 20, 1948, they first consummated and completely closed the deal with the Hollands and Murie, the deal was stated to them, some of the papers read to them, they executed and delivered the statutory Warranty Deed, and the check for $100,000 was delivered to them, and in his "exuberance" Murie took the check and waving it saying, "that is the most money we have ever had in our life. We are entirely satisfied with this transaction." Then the parties all remained for the closing of the deal with the Moretons and it was only then that they claim that this

4 Utah 2d—21

complete disclosure was made by Mathesius reading aloud a letter of transmittal from himself to Moreton which stated that $287,500 was being paid for the Moretons' interest. It is also claimed that in their presence revenue stamps were affixed to each deed which indicated the difference in the consideration paid for each of them. The testimony of Rex Holland and his mother, who was also present and signed the Hollands and Murie papers, is positive that they heard no such letter or other documents read at that time or at all and observed no revenue stamps being attached to the deeds. This is the main dispute as to facts, events and occurrences between the parties on this appeal. Certainly this dispute is genuine.

We turn to consider the acts of the Columbia Iron Mining Company by which it is claimed that it actively participated in and acted in concert with Moreton misleading and defrauding the plaintiff.

We begin with Rex Holland's letter to Mathesius dated September 14, 1948, and the events which followed. Therein Rex accused Moreton of misleading and misrepresenting the facts, particularly with reference to the estimated tonnage in the claims, and thereby inducing them to agree to accept $100,000 for their interests. Part of his statements about the estimated tonnage was obviously inaccurate. He further stated that their agreement with Moreton would expire at the end of September, 1948, suggesting that this was conditional on the

termination of active negotiations by Moreton for a sale of the property. He asked Mathesius to write to Moreton canceling the sale and send him a copy of that letter; suggested that in that way they would be able to obtain three-fourths of the purchase price of the property and expressed the hope for an immediate answer. This letter was from an owner of an undivided joint interest in the property which Mathesius as president of Columbia Iron Mining Company was negotiating to purchase, he was not an intermeddler writing about property which was none of his business. He was obviously mistaken as to some of his facts, he clearly indicated that he was seeking information as to others, and he made a proposition that Mathesius help him as against Moreton in obtaining what he stated were the rights of the original owners. Although we may agree that his proposition was not in good taste, it would seem that he was entitled to an answer stating Mathesius' position and giving him the information which he lacked. Mathesius by his own testimony refused to answer this letter because Rex had a bad reputation and because he did not intend to go around Moreton, their connection in that transaction, and because he concluded that Rex was not telling the truth about the contract with Moreton expiring at the end of September.[7]

Mathesius took Rex's letter and read it to Moreton, who showed him the undated "Option" to purchase and the "Agreement of Ownership" in support of his proposal that all the purchase price in excess of $100,000 from the sale be distributed to him. In his deposition Mathesius testified that "Moreton stated in substance that in his opinion he was both right and fair in this, the right being based on the above documents, and the fair on the fact that he had kept the Hollands and Murie 'in feed' many times over the last twenty years." Mathesius seemed to fully sanction this statement for he read it three times in the course of his deposition from notes previously prepared by him for reference, but he fails to explain how those instruments could make it right that he receive more than eight times as much from his one-fourth interest as the Hollands and Murie did for theirs without exercising his option to purchase or selling the property on the basis of the amount of ore realized from the claims. It is also noteworthy that Moreton's deposition does not corroborate this

7. How he reached this conclusion is not apparent for the Option is undated, specifying an "option for a period of twelve months from date hereof, (and so long thereafter as the said Arthur E. Moreton shall have negotiations for the sale of said claims to others, actively pending)." In his letter Rex recognizes the "pending" clause in the following paragraph: "You will please send me a duplicate copy of the letter advising Mr. Moreton of the refusal to purchase the property until Nov. 1st, 1948 so that he cannot in a future agreement between us insert the clause that the sale under the old agreement is 'still pending.' "

extra judicial statement that he had kept the Hollands and Murie "in feed many times during the last twenty years," for he stated therein that he met Rex Holland for the first time in April, 1946, when he became interested in this property and his father only about ten years before. Mathesius made his deposition after studying the transcript of Moreton and Heald's depositions and with extensive notes before him. He took care to repeat every argument which Moreton advanced to support his position, and in this and many other ways he definitely indicated his anxiety to see Moreton succeed.

Mathesius testified that during the conversation when he read Rex's letter to Moreton, he stated that he did not want to purchase a law suit and that before the negotiations were closed he wanted positive proof in writing that the original owners were satisfied with the conditions whereby they were to receive only $100,000, and that they did not care how much Moreton got. He did not require proof in writing or otherwise that they knew how much the total purchase price was or the amount which Moreton was receiving. The letters from the Hollands and Murie which were drawn up by Moreton fully complied with all of his requirements, but failed to indicate that the original owners knew the total purchase price of the claims or the amount which Moreton received, and there is no writing in evidence which indicates that they had that knowledge. Both Mathe-

sius and Heald admitted that after they received the offer of October 16, 1948, and the accompanying letter and also the confirmatory letter of November 20, 1948, they noticed that neither of these instruments nor any other instrument indicated that they were in possession of that information, and after discussing this situation they concluded that this called for a complete disclosure to the original owners of all of the details of this transaction, including the amount which the Moretons received at the time of the closing of the deal. This they claim they accomplished by reading some letters after all the papers involving the original owners had been signed and the check paid to them. Apparently these instruments met all of the requirements which Mathesius specified. These specifications seem to have been made deliberately and to have been approved by Mathesius and Heald after the offer and letters had been received, which suggests that they intentionally did not require a disclosure to the original owners of the total purchase price or the amount to be received by the Moretons or of information from which this amount could be calculated.

After the terms of the sale were agreed upon, the company sent Moreton its proposed draft of the papers to close the deal. In this proposal only one set of papers were drawn which would require the signature of both the original owners and of the Moretons, and thereby the original owners would have the opportunity to inspect and sign instruments which would disclose the

amount to be paid to the Moretons. Moreton returned these proposals suggesting that two sets of papers be drawn, one covering the deal between the company and the Moretons and the other covering the deal between the original owners and the company, claiming that he wanted to avoid thereby warranting the title of the interests of the original owners. The company adopted this suggestion, making it unnecessary for the original owners to inspect and sign documents which recited the total purchase price and the amount to be paid to the Moretons. Both Mathesius and Heald admitted that this was an unusual procedure and that although they were pressed on that question they did not claim to know of any other similar transaction in which the company was involved. This transaction is consistent with and lends support to appellant's contention that this information was being intentionally withheld from the original owners, and would reasonably support a finding to that effect.

It is undisputed that the company purchased these three claims from four different owners each owning a one-fourth undivided joint interest, that the deal was negotiated as one transaction and the company never considered purchasing the Moretons' Interest or the original owners' interests without purchasing all of them, and that the company paid to the Moretons $287,500, who owned only one-fourth interest in the claims, and only $100,000 to the original owners, who owned three-fourths interest in the claims. If the company actively participated in intentionally withholding from the original owners the full amount of the purchase price and the amount paid to the Moretons, and if the original owners were thereby induced to consent to receiving only $100,000, it is guilty of conspiring to defraud, and liable for the resulting damages. Mathesius, without dealing around Moreton, could have answered Rex Holland's letter and given him this information; he could have required Moreton to show by written statements signed by the owners that they knew the total amount of the purchase price and the amount to be received by the Moretons and that they were satisfied with such arrangements; he could have drawn only one set of papers in accordance with his own original proposal which would have disclosed this information to the original owners and which they would have had to read and sign. There are many other ways in which he could have brought this information to their attention in a manner which they could not dispute and which would have given them ample opportunity to deliberately decide whether to accept or reject this proposition. His failure to avail himself of any of these means is reasonably susceptible of the construction that he intentionally avoided disclosing this information to them.

There is no dispute that at the time when the payment was made to the Hollands and Murie and the deal closed as far as they were concerned, that no one had told them

or mentioned to them the amount of the total purchase price or the amount that the Moretons were to receive. Moreton claims that he had told them the estimated tonnage and that this estimate figured at twenty-five cents per ton was used in arriving at the total purchase price, but plaintiff claims that he never did tell them this price but represented that it was figured at only ten cents per ton. Both Moreton and Mathesius in their testimony mention many prices for ore between those figures, so Moreton's claim that everyone knew the going prices for ore is not valid. The testimony on this question is in direct conflict. This presents a genuine issue of fact which for the purpose of this motion must be assumed in favor of the plaintiff in determining whether respondents are entitled to a judgment as a matter of law.

Respondents claim that at the meeting at Moreton's office on December 20, 1948, when the deal was closed, after the Holland-Murie papers had all been signed and the $100,000 check delivered to them in the course of closing the sale as to the Moretons, Mathesius read to all assembled a letter of transmittal to Moreton in which the amount to be paid to the Moretons was recited, and that thereafter revenue stamps were attached to the two deeds which indicated the consideration which was paid for each of them. Both Rex Holland and his mother deny positively that they heard any such letter read or saw any revenue stamps affixed to the deeds. Again we must as-sume this fact in their favor because there is a direct conflict in the testimony, and on this motion we must take the facts in the light most favorable to the appellant. Also we must keep in mind that according to the respondent's own evidence, this reading and affixing the revenue stamps were done aft-er the Holland-Murie deal was closed and they had been paid and they were in a state of excitement, and as Heald expressed it— great exuberation. Under such circum-stances it could not be expected nor cal-culated that the reading of a letter not addressed to them and which did not pur-port to concern them would bring to their attention the amount which was being paid to the Moretons. Under such circumstances it would be reasonable for the trier of facts to find that such reading, if any, gave them neither knowledge nor notice of the amount being paid to the Moretons.

From the foregoing facts I conclude that it would be reasonable to find that the Co-lumbia Iron Mining Company conspired with Moreton to withhold from the Hol-lands and Murie information disclosing the amount of the total purchase price of this property and the amount to be paid to the Moretons, intending to thereby induce them to accept in full payment for their interests the sum of $100,000. It would not be unrea-sonable to conclude that in furtherance of such conspiracy Mathesius refused to an-swer Rex Holland's letter of September 14, 1948; that he required written proof that the original owners were willing to accept

$100,000 as their share of the purchase price but did not require such proof that they knew the total purchase price or the amount the Moretons were to receive, and no such proof that they knew these facts was ever produced; that the lack of such proof was recognized by Mathesius, who stated that this situation called for a complete disclosure of these facts eventually. It would also be reasonable to conclude that in order to avoid disclosing those facts to the original owners, Columbia divided the transfer papers into two sets, one covering the sale of the interests of the original owners and the other covering the interests of the Moretons, and that on the final closing of this deal no eventual disclosure of these facts was made to the Hollands and Murie. I think that it would also be reasonable to find from the evidence that Columbia through its officers knew that this information was being withheld from the original owners in order to induce them to agree to accept only $100,000 as their share of the purchase price, that Moreton was not entitled to all of the purchase price in excess of $100,000 under his option to purchase or agreement of ownership without his either exercising his option or selling the claims under a contract whereby the purchase price would be on the number of tons realized from the claims, and that this scheme was entered into in order to avoid the necessity of him meeting those requirements in order to claim all over $100,000. If such are the facts, then there is no showing that the respondent Columbia Iron Mining Company is entitled to a judgment as a matter of law.

I agree with Mr. Justice Crockett that the inquiry is strictly as to a legal duty of Mathesius to disclose this evidence and requires more than a mere moral or ethical duty. I also agree that he can be held legally responsible for conspiracy to overreach plaintiffs only if there was a wrongful scheme known to him to withhold this information and in furtherance thereof he wilfully did or omitted to do some act which he would have otherwise not done or omitted to do. However, if he knew of the scheme he had a clear, strictly legal duty not to conspire with Moreton nor to change his course in order to carry out that scheme.

I also agree that if there were a trial of this issue the plaintiffs would have the burden of persuading the fact finder by a preponderance of probability and that where all the circumstances are equally consistent with innocence as with guilt no such showing can be made However, this rule has no application to this case for there was no showing that the actions of Mathesius were equally as consistent with innocence as guilt, the mere fact that some of his actions might be considered consistent with innocence falls far short of the required showing in that rule. The rule requires that it must be manifest that his actions be equally as consistent with innocence as guilt and under circumstances where it would be unreasonable to hold

otherwise. Such rule is usually applied to cases where the only evidence of the rate of speed of a motor vehicle is between specified figures and the court holds that this shows no preponderance of probability as between one of such rates as against the other. It is also applied to cases where the circumstantial evidence points equally to two persons as the perpetrator of a crime but does not indicate which one of such persons is guilty, and to cases where an expert witness indicates that either one of two theories is equally probable. It can have nothing to do with a case where as in this case there is nothing in the evidence which indicates that the two propositions are equally as consistent with the evidence.

Here Mathesius admits that he received the letter from Rex Holland claiming that Moreton was misrepresenting the facts to them, that he failed to answer that letter but took it to Moreton who showed him the contracts between them, that he thereupon required Moreton to get written statements from the Hollands and Murie that they were willing to accept $100,000 in full payment for their interests in the claims, that Moreton asserted both a legal and moral right to all over that amount; that after the required letters were received he and Heald noticed that none of those statements indicated that plaintiffs knew the amount which Moreton was to receive from this deal and that they decided that this called for a complete disclosure to plaintiffs of that information which he claims they later made. The only doubtful issues on this question is whether Mathesius agreed with Moreton either tacitly or otherwise not to disclose to plaintiffs the amount of money Moreton was receiving. On this point the circumstances seem almost conclusive against Mathesius. It is clear that without such an agreement both Moreton and Mathesius knew that there was no chance to mislead the plaintiffs, and every move that Mathesius made thereafter clearly indicates that such an agreement had been made and was being followed strictly. He failed to answer Rex's letter, he required that Moreton furnish a statement from the plaintiffs only that they were willing to accept the $100,000 without showing that they knew the amount which Moreton was receiving. He noticed and discussed with Heald that these statements failed to disclose that they had knowledge of such amount, he concedes that he had a clear duty to make such a disclosure and still without making such disclosure, at Moreton's suggestion, and on a ridiculous pretext, he made two sets of papers one to be signed by the Moretons and the other to be signed by the Hollands and Muries, which fits right in with Moreton's scheme for withholding this information, and then closed the deal with the Hollands and Muries without saying one word to them of the amount which Moreton was to receive. This I conclude would clearly justify an inference that Mathesius had entered into such conspiracy and was

actively changing his course in accordance therewith.

I would therefore reverse the case and direct the trial court to proceed with the action as to the Columbia Iron Mining Company.

WORTHEN, J., does not participate herein.